**426**

leave covering the same period and governed by the same statute and regulations.

As to plaintiff's third contention, we find nothing in the statute, House or Senate reports [2] that indicates the widow was to be given any more rights than the employee who earned the leave. Therefore, since Nagle could not maintain a suit in this court because of. the six-year limitation statute, it is axiomatic that his widow would have no greater rights.

Defendant's motion to dismiss plaintiff's petition is granted, and the petition is dismissed.

It is so ordered.

JONES, Chief Judge and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

The WASHINGTON TITLE INSURANCE COMPANY, a corporation

v.

The UNITED STATES.

The DISTRICT TITLE INSURANCE COMPANY, a corporation

v.

The UNITED STATES.

The LAWYERS TITLE INSURANCE COMPANY, a corporation

v.

The UNITED STATES.
Nos. 116-53 to 118-53.

United States Court of Claims.
Nov. 8, 1955.

2. H.Rept. 1836, S.Rept. 1300.

Louis M. Denit, Washington, D. C., for plaintiffs. Brandenburg & Brandenburg, Washington, D. C., were on the brief.

Leland T. Atherton, Washington, D. C., with whom was H. Brian Holland, Asst. Atty. Gen., for the defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

In each of these suits plaintiffs seek to recover an overpayment of income taxes for the years 1945, 1946 and 1947. They involve common issues and were consolidated for trial. For convenience we shall refer to the plaintiffs as Washington, District and Lawyers. All three were incorporated in the District of Columbia, and during the years in question District did business in the District of Columbia, Maryland and Virginia while Washington and Lawyers were authorized only to do business in the District of Columbia and Maryland.

Plaintiffs' business consisted of the insuring or certifying of titles to real estate and the transacting of business related thereto, with the greater portion of their income being derived from the issuance of Certificates of Title, hereinafter referred to as certificates, and Owner's Policies, hereinafter referred to as policies, which were issued to purchasers of real estate. In general, the former protected only against defects in record title while the latter protected against all defects whether of record or not.

On March 17, 1922, in order to eliminate duplication of title plants and records, plaintiffs entered into a working agreement whereby they would issue joint certificates or policies on the titles examined, and share net profits and losses therefrom on a percentage basis of 40 percent each to District and Lawyers, and 20 percent to Washington. After this agreement was executed none of the plaintiff companies issued separate certificates or policies, except in Virginia where separate ones were issued by District. Following an agreement among plaintiffs dated March 17, 1942, effective as of October 1, 1936, as to contracts written prior to March 17, 1942, Lawyers and Washington became jointly and severally liable with District on all certificates and policies issued by District respecting property situated in Virginia. This agreement provided a similar sharing of profits as before but effective as of January 1, 1942, on Virginia business.

Pursuant to Virginia and Maryland statutes, each of the plaintiffs had established during the years in question reserve accounts. The amount in these accounts was derived by setting aside 10

percent of the premiums received on Virginia certificates and policies and 8 percent on Maryland policies.[1] These amounts were allotted to each of the companies on the basis of the percentages set forth in the 1922 agreement. In their separate income tax returns for the years in question, plaintiffs took and were allowed as deductions in computing taxable net income the amounts each carried in the reserve accounts (finding 9).

In 1947, the Maryland Insurance Department and the Virginia Bureau of Insurance conducted a joint examination of the affairs and financial condition of each of the plaintiffs. In their report the insurance examiners recommended the establishment of statutory reserves beginning with the year 1927, and based on revenue from all three jurisdictions. They agreed that the 10 percent reserve provided by the Virginia statute, since it was higher than that of the Maryland law, was adequate and should be used as the proper measure for the three companies.

The applicable Virginia statute, Section 4325a, subsection (e),[2] of the Virginia Code (1942), reads as follows:

"On any contract of title insurance, hereafter issued by a domestic title insurance company, there shall be reserved initially a sum equal to ten per centum of the original premium, whether or not the risk shall be for a fixed time. If for a fixed time, then at the end of each year for the first five years, there shall be a reduction in the sum reserved of one per centum of the original premium, and thereafter at the end of each year of the remainder of said time a reduction of a pro rata portion of the remaining five per centum thereof, except that if the risk is of a mortgagee, trustee in a deed of trust to secure debt, or creditor secured thereby, no reduction shall be made that will decrease the sum reserved below five per centum of the original premium, until the expiration of the time of the risk. If not for a fixed time, then a risk shall be deemed to have been written, if of an owner of property, or any interest therein, for twenty years from the date of the contract, and if of a mortgagee, trustees in a deed of trust to secure debt, or creditor secured thereby, for a time expiring three years after the final maturity of the debt as stated in the mortgage or deed of trust, or for twenty years from the date of the contract, whichever time shall be longer. On any contract of title insurance heretofore issued, a reserve shall be set up and hereafter maintained, in such sum as would have been required if the above requirements had existed at and after the date of the contract. Said sums, herein required to be reserved for unearned premiums on contracts of title insurance shall at all times and for all purposes be considered and constitute unearned portions of the original premiums. In calculating reserves, contracts of title insurance shall be assumed to be dated in the middle of the year in which they were issued."

The recomputed reserves were set up on plaintiffs' books at the year ending December 31, 1948. They were based on the amounts received by plaintiffs as premium income from 1927 through 1947, less allowances for returns to income as

---

1. The record is silent as to why the Maryland certificates were excluded in computing the reserve accounts.

2. While this section mentions only domestic companies, its sanctions are apparently made applicable to foreign companies pursuant to section 163 of the Constitution of Virginia which provides as follows: "No foreign corporations shall be authorized to carry on, in this State, the business, * * * or be relieved from compliance with any of the requirements made of similar domestic corporations by the Constitution and laws of this State, where the same can be made applicable to such foreign corporations without discriminating against it."

provided in the Virginia statute (finding 13). After making this recomputation, each of the plaintiffs filed a timely claim for refund of income taxes alleged to have been overpaid for the years 1945, 1946, and 1947 (finding 20). Each of these claims was denied by the Commissioner of Internal Revenue and these suits resulted. The additional deductions claimed and the amount of tax refunds sought are set forth in finding 21.

The question presented is whether these reserves set up pursuant to the Virginia statute and constitution constitute allowable deductions or exclusions from income for the years in question under section 204 of the Internal Revenue Code of 1939, 53 Stat. 72, 26 U.S.C. § 204. The pertinent portions of that statute are as follows:

"§ 204. Insurance companies other than life or mutual

"(a) Imposition of tax—(1) In general. There shall be levied, collected, and paid for each taxable year upon the normal-tax net income and upon the corporation surtax net income of every insurance company (other than a life or mutual insurance company) and every mutual marine insurance company and every mutual fire insurance company exclusively issuing either perpetual policies, or policies for which the sole premium charged is a single deposit which (except for such deduction of underwriting costs as may be provided) is refundable upon cancellation or expiration of the policy taxes at the rates specified in section 13 or section 14(b) and in section 15(b).

"(b) Definition of income, etc.

"In the case of an insurance company subject to the tax imposed by this section— * * *

"(5) Premiums earned.

"'Premiums earned on insurance contracts during the taxable year' means an amount computed as follows:

"From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year. For the purposes of this subsection, unearned premiums shall include life insurance reserves, as defined in section 201(c) (2), pertaining to the life, burial, or funeral insurance, or annuity business of an insurance company subject to the tax imposed by this section and not qualifying as a life insurance company under section 201(b);
* * *."

Plaintiffs' position is (1) that both the certificates and policies are contracts of insurance and since the greater portion of their income was derived from their issuance, they qualify as insurance companies and are taxable as such under section 204; (2) that the reserves established pursuant to the Virginia and Maryland statutes are proper deductions within the meaning of that section; and (3) that, in any event, they are entitled to recover that part of the overpayment of taxes upon that part of their income attributable to the Maryland certificates by reason of their failure to so claim it along with the Virginia certificates in their returns for the years in issue.

Defendant contends that plaintiffs are not insurance companies within the meaning of section 204 and therefore not entitled to the deduction or exclusion which it provides. Even if found to so qualify, defendant would still deny recovery on the grounds (1) that when they received the premiums during the years in question, they received them under claim of right to do with as they saw fit, and the premiums are therefore includible in full, except for the reserves which in fact were established and allowed as deductions; (2) that the re-

serves which were established do not qualify as unearned premiums within the meaning of section 204; and (3) that plaintiffs in making an approximation as to the amount of the deductions claimed have failed to sustain their burden of proof which requires a showing not only of the legality of the deductions but their amount. Defendant also raises a constitutional question as to the application of the Virginia and Maryland statutes and contests any recovery based on the Maryland statute because of plaintiffs' failure to base any claim on that statute in their claims for refund filed with the Commissioner of Internal Revenue.

Defendant's initial defense is that plaintiffs are not classifiable as insurance companies, and therefore not entitled to the benefits of the above tax statute. While the basis for this contention is twofold, it stems from the distinction which exists between the language employed in the certificates and that which appears in the policies. The former, after reciting a consideration, states as follows:

"[We] Do Hereby *Certify* that at the date hereof, according to the records, the title to the real estate situate in * * *." [Italics supplied.]

The latter, whose status as insurance contracts the defendant does not seriously question, reads:

[We], subject to the conditions hereinafter set forth, do hereby *guarantee* that they will pay to * * *. [Italics supplied.]

Defendant urges that the certificates with their use of the word "certify" are not contracts of insurance but merely opinions by the companies that title to a particular piece of property is as stated in so far as record title is concerned. Since for the years in question the revenue from the certificates constituted the greater portion of plaintiffs' income, defendant asserts that it cannot be found that plaintiffs were in fact engaged in the insurance business.

This precise issue was before the Tax Court in Columbia Title Ins. Co. v. Commissioner, 3 T.C. 1099, and the Court of Appeals for the District of Columbia, in Real Estate Title Ins. Co. v. District of Columbia, 82 U.S.App.D.C. 170, 161 F. 2d 887, where the wording of the certificates of title was substantially the same as that now before us. The Tax Court emphasizing the word "certify" held the certificates not to be contracts of insurance. The Court of Appeals however held to the contrary. There, the court, at page 889, in refusing to decide the question on the narrow grounds of the choice of a word stated:

"We are of opinion the word [certify] must be read in its general significance and in harmony with the contract with which it is used; here it can mean nothing less than guaranty or warranty. * * *

"In the cases at hand the record abundantly shows that for more than half a century the general understanding of petitioners, the bar, and the public has been that each of the policies issued by petitioners creates a limited liability payable to the holder upon the breach of its conditions. *It is not their work as title examiners that petitioners insure. What they do certify is that the title to the property involved is good and marketable and their liability is conditioned upon the breach of this certification.* This by every token is insurance and nothing else. It would be a shock to the thousands of present policyholders of these companies to be told that all of this is untrue and that petitioners' liability is limited to a showing of negligence in the examination of the land records of the District. * * *" [Italics supplied.]

We believe the broader reasoning of the Court of Appeals to be correct, and as applied here leads to the conclusion that the certificates are contracts of insurance as that term is generally understood. This being so, it must like-

wise be held that plaintiffs were engaged in the insurance business during the years in question and therefore entitled to the benefits of section 204 if the reserves set aside otherwise qualify. United States v. Home Title Co., 285 U.S. 191, 52 S.Ct. 319, 76 L.Ed. 695.

Nor do we believe that the claim of right doctrine has application here. That doctrine has application to those situations where the taxpayer receives what purports to be income during a particular year but seeks to exclude it from income for tax purposes on the ground that events of a later year may operate to deprive the taxpayer of it. North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197. It differs from the cases here where the taxpayers overlooked a bona fide deduction only to discover its presence at a later date and then seek within the statutory period to claim the deduction and recover the overpaid taxes.

■■ Defendant raises the further question as to whether the type of reserve contemplated by the Maryland and Virginia statutes is the type for which section 204 allows an exclusion or deduction. Defendant contends that premiums paid for title insurance are earned when received and that the reserves in question set aside under the state statutes constitute merely solvency reserves rather than unearned premium reserves. This issue is also not new before the courts. The test that has been evolved is one of looking first to the state statute to determine whether it calls for the placing of funds in reserve for an indefinite period or whether the required reserve is a segregation of a portion of the premium income for a specified period when the risk is presumably greatest with its eventual release in later years. The former is looked upon as a mere solvency reserve outside section 204, while the latter is held to be a reserve within the meaning of that section. City Title Ins. Co. v. Commissioner, 2 Cir., 152 F.2d 859; Houston Title Guaranty Co. v.

Commissioner, 22 T.C. 989; Title & Trust Co. v. Commissioner, 15 T.C. 510, affirmed 9 Cir., 192 F.2d 934; Home Title Guaranty Co. v. Commissioner, 15 T.C. 637; Early v. Lawyers Title Ins. Corporation, 4 Cir., 132 F.2d 42. See also I. T. 3798, 1946–1 Cum. Bull. 127.

This distinction we believe to be a valid one. It cannot be supposed that section 204 with its use of the term "unearned premiums" intended to exclude for all time the funds which it allows to be excluded in determining earned premiums. That section using the above term contemplates that at some future date the funds placed in the reserve will be deemed to have been earned at which time they will be released and subject to taxation. A solvency reserve provides for no such future release.

Here the Virginia statute does provide for the eventual release of the reserve funds and in the Early case, supra, which involved the same Virginia statute, the reserve established in conformity with it was held to be one of unearned premiums and deductible under section 204. In speaking of the Virginia statute, the court, 132 F.2d at page 45, stated:

"* * * We agree that a statute of the state could not be given the effect of withdrawing from taxation under the Revenue Act what was in fact an earned premium by the mere device of calling it unearned; but the Virginia statute does more than this. It gives to the portions of the premiums which it requires to be placed in the reserve all of the attributes that pertain to unearned premiums, i. e. it withdraws them from the power of the company to use them for its general purposes and impresses them with a trust in favor of contract holders until the risk shall have been carried for the period that the statute prescribes. Until this period has expired, the company has no more control over them than a life insurance company has over the unearned por-

tion of the premium paid for life insurance or than a fire insurance company has over the portion of the premium applicable to an unexpired risk. Until then, the company cannot be truly said to have earned the portion of the premium which the law requires it to reserve and hold in trust during this crucial period of risk."

As pointed out above, plaintiffs' reserves were not established out of any particular earnings of any particular year but their amount was computed on 10 percent of plaintiffs' income from certificates and policies issued during the 1927–1947 period, including the three taxable years in dispute, and then assigned to each of the plaintiffs in conformity with the percentages contained in the 1922 agreement on a year to year breakdown. Thus, it is impossible to earmark or determine from the book entries, which were made at the close of 1948, what part of the reserves represented a portion of the actual premiums received in 1945, 1946, and 1947. In furnishing this approximation rather than the actual amount permitted under the Virginia statute, defendant contends that plaintiffs have failed to prove their case.

■■ The method adopted by plaintiffs in re-establishing their reserve accounts was a fair and reasonable one and was the one suggested by the insurance examiners whose sole purpose was to bring the total amount of those accounts into conformity with state requirements in so far as it was possible at that time. The relationship of those accounts as revised to the tax problem was apparently not considered at the time. While it is true, as defendant asserts, that the burden is on the taxpayer to prove the amount of any deduction claimed, we believe that plaintiffs have met that burden here. From the figures set forth in findings 6 and 21 it is quite apparent that the deductions now claimed are less than what plaintiffs would have been entitled to if they had applied the percentage found in the Virginia statute to their income received on certificates and policies issued during the years in question. They, of course, could make no claim for any greater amount than what they did in fact establish in the reserve accounts. Since the amounts now claimed were in fact established in the reserve accounts and are less than what the full percentage of the Virginia statute would allow, we find no objection to the acceptance of plaintiffs' figures.

■ Defendant also challenges plaintiffs' right to recover on the ground that since the Virginia statute as applied here reaches revenue collected outside that state, it is in conflict with the Federal Constitution which, defendant asserts, prohibits a state from taxing receipts beyond its jurisdiction or control. First, of course, it should be noted that the statute with which we are concerned is not a taxing statute. It is, however, true that the reserves established included a percentage of income derived outside either Maryland or Virginia and were required of companies not doing business in Virginia. However, in the face of the operating agreement among the plaintiffs, and the belief of the insurance departments that the policy and certificate holders of those states would not be protected to the extent that their laws required unless the reserves were established as recommended, we find the requirement neither unreasonable nor in violation of the Constitution. It cannot be found that Maryland and Virginia have no definable interest in the contracts issued by the plaintiffs, or that the statute in question seeks to regulate matters which are totally unconnected to any local interest. Osborn v. Ozlin, 310 U.S. 53, 60 S.Ct. 758, 84 L.Ed. 1074; Watson v. Employers Liability Corp., 348 U.S. 66, 75 S.Ct. 166.

In view of the foregoing we need not discuss the application of the Maryland statute.

Plaintiffs are entitled to recover and judgment is entered for them in the following amounts, together with interest on each amount as provided by law:

| Year | | Amount |
|------|---|--------|
| 1945 | The District Title Insurance Co | $11,645.23 |
| " | The Lawyers Title Insurance Co | 12,539.91 |
| " | The Washington Title Insurance Co | 6,269.96 |
| 1946 | The District Title Insurance Co | 7,879.58 |
| " | The Lawyers Title Insurance Co | 7,879.58 |
| " | The Washington Title Insurance Co | 3,938.79 |
| 1947 | The District Title Insurance Co | 6,406.00 |
| " | The Lawyers Title Insurance Co | 6,406.00 |
| " | The Washington Title Insurance Co | 3,203.00 |

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

**Aubrey H. BOND**

v.

**The UNITED STATES.**

**No. 390–54.**

United States Court of Claims.
Nov. 8, 1955.

A. M. Prentiss, West Hartford, Conn., for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was Acting Asst. Atty. Gen., Joseph D. Guilfoyle, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.