KESSMAR CONSTRUCTION CO., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 89333–89348.   Filed February 13, 1963.

*Nathan Schwartz, Esq.*, and *Bert Z. Tigerman, Esq.*, for the petitioners.

*Karl M. Samuelian, Esq.*, and *John Schessler, Esq.*, for the respondent.

BRUCE, *Judge:* The respondent determined deficiencies in petitioners' income tax for the fiscal period ended July 31, 1955, as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 89333 | Kessmar Construction Co | $3,639.07 |
| 89334 | Evalar Construction Co | 3,217.65 |
| 89335 | Hillred Construction Co | 3,485.12 |
| 89336 | Texlar Construction Co | 3,764.71 |
| 89337 | Barjim Construction Co | 3,583.62 |
| 89338 | Harlo Construction Co | 3,863.51 |
| 89339 | Gart Construction Co | 3,728.46 |
| 89340 | Loumark Construction Co | 3,919.76 |
| 89341 | W–R–B Construction Co | 3,476.95 |
| 89342 | Nevcal Construction Co | 3,585.64 |
| 89343 | Marboy Construction Co | 3,611.88 |
| 89344 | B–L–M Construction Co | 3,645.74 |
| 89345 | Calvada Construction Co | 5,156.25 |
| 89346 | Rothmar Construction Co | 3,552.80 |
| 89347 | Harben Construction Co | 3,714.70 |
| 89348 | Benmar Construction Co | 3,611.11 |

The sole issue for decision is whether the respondent erred in determining that the 16 petitioners were part of a single integrated business enterprise and that a single minimum surtax exemption of $25,000 was allocable among them in the amount of $1,562.50 each, in accordance with section 269, section 482, section 1551, and other applicable provisions of the Internal Revenue Code of 1954.

Some facts are stipulated.

[1] Proceedings of the following petitioners are consolidated herewith: Evalar Construction Co., Docket No. 89334; Hillred Construction Co., Docket No. 89335; Texlar Construction Co., Docket No. 89336; Barjim Construction Co., Docket No. 89337; Harlo Construction Co., Docket No. 89338; Gart Construction Co., Docket No. 89339; Loumark Construction Co., Docket No. 89340; W–R–B Construction Co., Docket No. 89341; Nevcal Construction Co., Docket No. 89342; Marboy Construction Co., Docket No. 89343; B-L-M Construction Co., Docket No. 89344; Calvada Construction Co., Docket No. 89345; Rothmar Construction Co., Docket No. 89346; Harben Construction Co., Docket No. 89347; and Benmar Construction Co., Docket No. 89348.

FINDINGS OF FACT.

The stipulation of facts and exhibits thereto are incorporated by this reference.

The petitioners are corporations organized under the laws of the State of Nevada. Their books are kept and their Federal income tax returns prepared on the cash basis of accounting. They filed returns for a fiscal period ending August 31, 1954, and returns for the fiscal period September 1, 1954, to July 31, 1955. Their returns were filed with the district director of internal revenue at Reno, Nev.

All the petitioners except Calvada Construction Co. were organized on September 14, 1953. Calvada was organized on April 19, 1954. The stockholders of each petitioner were Ben Weingart and Louis H. Boyar, each of whom held one-third of the stock, and Mark Boyar and G. Harry Rothberg, each of whom held one-sixth of the stock. For convenience, these four individuals are sometimes referred to herein as the promoters. The directors of all the petitioners were Mark Boyar, Rothberg, and Samuel Dobkin, and the officers were Mark Boyar, president; Rothberg, vice president; Dobkin, secretary; and L. B. Harbour, Jr., and Harold Larson, assistant secretaries.

Nevada Western Projects Corp., hereinafter referred to as Nevada Western, was organized September 29, 1953, under the laws of Nevada. It was a wholly owned subsidiary of Syndicate Mortgage Co., which was a wholly owned subsidiary of Investors Diversified Services, Inc., of Minneapolis, Minn., hereinafter referred to as IDS. Western Projects Corp. was also a wholly owned subsidiary of Syndicate Mortgage Co.

During the year 1954 the promoters, through the petitioners and other corporations organized by them, and under agreements with IDS or its subsidiaries, constructed 315 single family dwelling houses in an area of Las Vegas, Nev., known as Charleston Park.

The land was acquired in two adjoining parcels, identified as Tract 1 and Tract 2. Title was taken in the name of Ben Weingart by deeds recorded on August 31, 1953. The purchase price of Tract 1 was $132,469.20 and of Tract 2 was $110,220. The land was platted for residential subdivisions and the plats were recorded on November 2, 1953.

The plan for building and selling the houses in the Charleston Park area was discussed by Weingart and Louis H. Boyar with representatives of IDS and a contract between the promoters and IDS was agreed upon for the project.

When the arrangements for the contract were under discussion, the mortgage division of IDS addressed a memo dated August 13, 1953,

to the mortgage committee of IDS concerning proposals for construction at Los Angeles, Phoenix, and Las Vegas, reciting:

The above deal contemplates a participation with Weingart and others whereby they are getting $2,500,000 prior commitments from FNMA [Federal National Mortgage Association] for Los Angeles, $3,500,000 for Phoenix, and $3,500,000 for Las Vegas. The houses would be built under Section 213 of FHA.

If we make the construction loan, which carries an interest rate of 4¼%, we would get a prior commitment from FNMA to purchase the above FHA loans upon completion. The loans will average about $11,500 each. We will receive interest during construction under the FHA limitations, which at the present time is 4¼%, and the Weingart group will agree to give us 25% of their profits. The profits to IDS would be from $400 to $450 per house.

IDS will advance the purchase price of the land and it is to be handled in the same manner as other recent 213 deals with the Weingart group. IDS will make a temporary construction loan of approximately $9,500,000 for the three projects. IDS will have a prior commitment from FNMA before any advances are made. We will then have the servicing of these loans for FNMA until such time as FNMA sells them to other purchasers.

The developers of this project have been most successful, as the Mortgage Committee is aware, and this participation is recommended by all members of the Mortgage Division, as well as by Mr. C. J. Ryan. Will you please indicate your approval on the attached copy of this letter of submission.

The arrangements effected between the promoters and the lender's representatives in California were stated in a teletype communication from R. E. Foresman, a representative of IDS, to J. R. Ridgway, a vice president, at the home office of IDS in Minneapolis, expressing the agreement substantially as follows:

Re 213 projects Las Vegas and Los Angeles County with Boyar and Weingart, arrangements completed subject to your approval for making 213 sales type loans in Las Vegas totaling $3,467,500 with average individual loan of approximately $12,000 for 285 loans

Construction loan at four and one quarter percent interest on insured advances

Individual loans on completion at four and one half percent interest forty year maturity

Los Angeles County Management type total loan $2,175,000 at four and one quarter percent forty years maturity on leasehold

IDS to receive one and one-half percent lenders service charge on Las Vegas construction loan and one percent on individual Las Vegas loans total $86,687 and to receive one and one half percent on Los Angeles County Loan total $32,625 and based on estimated repeat estimated profits Western Projects Corporation would receive $464,210 as forty two and one half percent on the profits of the joint venture of that corporation with Boyar and Weingart Corporation from the construction of Las Vegas properties

Also Western Projects would be the owner of an undivided forty two and one half percent interest in 57 lots in Las Vegas at a cost of $17,345 for such interest which based on FHA appraisal of project lots would have a value substantially larger

Western Projects would not participate in any way in the Los Angeles County project

Recap of total profits and fees

| | |
|---|---|
| $446,865 | Cash profit to Western Projects Corporation |
| 17,345 | Forty-two and one-half percent interest in 57 lots at cost |
| 119,312 | Total fees to IDS Inc |
| $583,522 | Total |

Arrangements for the joint venture agreements for construction and sales of Las Vegas project would be as set out in a letter from Weingart and Boyar to Western Projects and quoted below as follows

Quote . . .

To Western Projects Corporation

Gentlemen

We have discussed with you a joint venture with respect to FHA 213 sales type projects for Las Vegas, Nevada, and in that connection we now propose as follows

1. We have arranged to purchase real property in Las Vegas, consisting of approximately 71 acres, which will be subdivided to provide a total of 342 lots, of which 285 will be used for 15 cooperative 213 projects of 19 lots each which we will sponsor. IDS Inc has received a certificate of eligibility with respect to each cooperative

2. Your company or its nominee will advance funds to the joint venture for the cost of acquisition of this property, not exceeding $245,000. When acquired, this real property will belong to a joint venture consisting of ourselves or our nominee and your company or its nominee, although you may take title in any name you designate. In this joint venture the joint venturers will have the same proportionate interests as set out in paragraph 4 below. This joint venture will sell 19 lots to each cooperative at cost plus five percent interest thereon from these sales

3. A separate joint venture consisting of your corporation or its nominee and a Nevada corporation to be formed by us for each separate joint venture will engage in the sale of memberships and construction of improvements and dwelling houses for each cooperative

4. Profit of each joint venture will be shared as follows

Forty two and one half percent to your company or its nominee

Fifty seven and one half percent to ourselves

If there should be any losses, they are to be shared in the same proportion

5. You are to loan funds to each joint venture at the rate of not to exceed $1000 per house to provide working capital. This loan will bear five percent interest. We will provide not to exceed $2000 paid in capital for each of our joint venture corporations

6. In the event that you advance funds for the land acquisition, we agree that at your request we will purchase the property from the joint venture and pay therefor, in cash the full amount advanced by you for acquisition costs, plus interest at five percent, with respect to any portion thereof

Parenthesis Other than the remaining 57 lots end parenthesis

As to which

A. Purchase and payment is not made by a cooperative corporation or

B. Any project mortgage is not initially insured by FHA for any reason other than default of the mortgagee

7. We estimate, but in no way guarantee, that your share of the profits resulting from all of the joint ventures, if the projects proceed as we anticipate will aggregate $464,210 of which $446,865 will be in cash and $17,345 will be invested

in your forty two and one half interest in the remaining 57 lots mentioned above calculated at cost. If you should elect to do so, you may require us to purchase for cash your interest in those lots at any time within seven months from the date hereof

While we cannot be specific as to dates it is intended to proceed promptly and it is estimated that all of these projects will be fully completed and occupied by March 31, 1954

End of Quote. . . .

When loan commitments are issued for both projects they will be contingent on IDS obtaining prior commitments from FNMA for purchase at par

In this connection we will receive a letter from Weingart and Boyar as follows

Quote. . . .

To    Investors Diversified Services Inc

Gentlemen

In consideration of your issuance of commitments for the making of loans to Charleston Park Mutual Homes Corporation aggregating $3,467,500 and to Woodland Park Mutual Homes aggregating $2,175,000 which commitments are conditioned on the obtaining by IDS Inc of prior commitments from FNMA to purchase all loans respectively involved at par plus accrued interest, we jointly and severally undertake and agree to pay to IDS on demand the amount of any commitment fee paid by that corporation to FNMA with respect to any of the loans referred to above in the event that

A. A timely commitment for the insurance of such loan is not issued by Federal Housing Administration, or

B. Such loan is not promptly insured by FHA, or

C. If any such loan insured by FHA fails to meet the requirements of FNMA for purchase

Unless such FHA commitment is not issued or insurance is not effected or such FNMA requirements are not met by reason of some default on the part of the mortgagee

We acknowledge that in the event a commitment or insurance is refused or requirements of FNMA are not met by reason of participation of Western Projects Corporation or its nominee in any joint venture relating to the construction of the Las Vegas project, such reason shall not constitute a default by the mortgagee

End of Quote. . . .

With respect to FHA insurance and FNMA commitment, Daniel E Farr has authorized us to quote his attorneys opinion as follows

Quote. . . .

I am familiar with the contemplated arrangements by IDS Inc for the making of 213 loans in Las Vegas and in Los Angeles County which will provide a total to the lender in addition to interest amounting to two and one half percent on the Las Vegas project and one and one half percent on the Los Angeles County project, also the proposed joint venture arrangements relating to the sale of the memberships and the construction of the dwellings and improvements for the Las Vegas project

It has been the practice to notify FHA in writing at the time of initial insurance that the construction contractor is a joint venture and that one of its joint venturers is a corporation all of the stock of which is owned directly or indirectly by IDS Inc

In my opinion, and particularly if such practice is continued, these arrangements will not be contrary to or in violation of any existing applicable laws, rules, or regulations and will not prevent any sponsor, builder, borrower or mortgagee from executing such certificates as are required with respect to interest, commissions, fees and charges

In this connection attention is invited to the opinion of Hale and Dorr directed to IDS Inc dated January 15, 1953

Also it is my understanding that Mr R. W. Purcell of IDS Inc has considered and approved similar arrangements by that company in connection with California loans

End of Quote. . . .

Weingart and Boyar believe it extremely urgent that FNMA commitments be applied for before September 1st

Please advise your decision before noon your time and if approved we will submit applications to FNMA, pay their commitment fee and proceed otherwise as you direct

The proposal stated above was sent by Weingart and L. H. Boyar for the promoters addressed to Western Projects Corp., under date of August 31, 1953, and was accepted on behalf of that company by R. H. Foresman, president, on the same date. The guaranty agreed upon was made in a letter of August 31, 1953, by Weingart and L. H. Boyar addressed to IDS in Minneapolis.

The promoters had previously built housing in the Los Angeles area under arrangements with IDS for providing loans and with the Federal Housing Administration, herein referred to as FHA, for insuring the loans under section 213 of the National Housing Act, as amended. Under these arrangements it was the practice that FHA would not permit the buyer of a house in a group to acquire the house contracted for until all the houses in the group were ready for occupancy. This resulted in delays when bad weather delayed construction, and sometimes houses were ready long before the buyers could acquire them because others in the group were not completed. The promoters therefore found it desirable to reduce the number of houses in a group to facilitate completion and permit earlier occupancy.

An analysis of the proposed development by an appraiser for IDS, dated September 14, 1953, and approved by Foresman states in part:

ANALYSIS

of a

PROPOSED 285 HOUSE CO-OPERATIVE DEVELOPMENT LOCATED IN LAS VEGAS, NEVADA

FHA TITLE 2, SECTION 213 LOANS

PROJECT: We are proposing a sales type FHA Title 2, Section 213 blanket loan in the amount of $3,467,500.00 to be made to 15 Nevada cooperative corporations sponsored by Weingart and Boyar, known as First Charleston Park Mutual Homes, Inc., Second Charleston Park Mutual Homes, Inc., Second Charleston Park Mutual Homes, Inc., etc. through Fifteen. Each cooperative corporation will acquire 19 lots, and the construction will be done by a different contractor for each corporation. In each instance, the contractor will be a joint venture consisting of a separate corporation formed by Weingart and Boyar and Western Projects Corporation or its nominee.

\* \* \* \* \* \* \*

The individual loans will be written for terms of 40 years, and will bear interest at 4½%.

This commitment is conditioned on the obtaining by I.D.S. Inc. of prior commitments from Federal National Mortgage Association to purchase all individual loans at par plus accrued interest.

AREA: The property is located in the City of Las Vegas, Clark County, Nevada, and is situated in the Huntridge-Charleston District which is the best residential area in Las Vegas and which is near the downtown shopping center, schools, and churches. * * *

* * * * * * *

BORROWER: Charleston Park Mutual Homes 1 thru 15 will be cooperative non-profit corporations, organized to carry out the above project for its 285 members. These members will have paid a total of approximately $114,000 for their memberships. In addition, impounds of approximately $180 will be collected to provide a working capital fund equal to 1½% of the proposed blanket loan. If additional moneys are needed to bring this fund up to the full 1½% of the proposed blanket, they will be supplied by the contractor. FHA approval of the credit ratings of the members will be secured, thus making them eligible as future borrowers under Section 213. At the completion of construction, the members will, upon surrendering their certificates of membership and executing the necessary loan documents, be deeded the individual properties they have selected. When all properties have been so deeded and released from the blanket loan, the cooperative corporations will be dissolved.

BUILDER: The contractor for each mutual will be a joint venture composed of two general partners, a corporation formed by Ben Weingart and Louis Boyar, and Western Projects Corporation or its nominee. Our direct knowledge of Ben Weingart and Louis Boyar gives us the utmost confidence in their integrity and ability. Western Projects Corporation is a solely owned subsidiary corporation of Syndicate Mortgage Company.

FHA will be advised by letter concerning the corporations forming the joint venture prior to its initial endorsement of the blanket mortgage.

The joint venture, and Ben Weingart and Louis H. Boyar, as individuals, will furnish such guarantees of completion as are required by FHA.

The joint venture agreements will provide that each partner shall contribute amounts up to $2,000 for working capital for each of the mutuals. It will further provide that Western Projects Corp. will lend the joint venture up to $1,000 per house, if required for additional working capital. This loan will bear 5 percent interest.

Charleston Park Mutual Homes 1 thru 15 will contract with the joint venture for the installation of the tract improvements and the construction of the dwellings.

HOUSE: There will be a total of 285 single family dwellings with 4 different basic plans, * * *

FHA ESTIMATED REPLACEMENT COST: The FHA estimated replacement cost will be slightly in excess of $4,022,000.

* * * * * * *

ESTIMATED PROFITS AND FEES: IDS is to receive 1½% lender's service fee on the blanket construction loan and 1% on individual loans or a total of approximately $86,687. Western Projects Corporation will share in all profits (or loss) of 15 joint venture building corporations and a 16th joint venture corporation in connection with 57 lots not included in the mutuals, for an amount equal to 42½% and it is estimated that the total profits realized will be

approximately $464,210. The cost to Western Projects for their undivided 42½% interest in 57 lots (through joint venture #16) will be $17,345. If these additional lots are sold for an amount based on FHA appraisal of mutual lots, Western Projects Corporation's profits will be substantially greater.

Western Projects Corp., by letter dated September 23, 1953, remitted $242,689.20 to Weingart and L. H. Boyar as advancement for the cost of the property at Las Vegas, the amount to be treated as a loan to the joint venture, and all the joint venturers agreed to be liable for repayment with interest at 5 percent.

Under date of September 28, 1953, Foresman, as vice president of Syndicate Mortgage Co., wrote Ridgway at Minneapolis in part as follows:

As you know, these loans were approved on the basis that we receive prior commitment contracts from FNMA for purchase of the final permanent loans. These were applied for under blanket applications on August 31, 1953 for each project. We are now advised that FNMA in Washington had given the local office authority to execute these contracts, however they requested that new contracts be submitted for the purchase of loans under each individual Mutual corporation. Such applications have been made and as soon as we receive the executed contracts, photostatic copies will be forwarded for your reference.

The contracts are for the lower amount of the loans, according to statements of eligibility from FHA issued August 14th and 17th, 1953. However, if 65% of the memberships of the cooperative corporations are sold to veterans, as contemplated by the sponsor, Lou Boyar, the loans will be increased by FHA and we will then have to make application for an increase in the FNMA commitments. We have been advised verbally that an allowance has been made in Washington for this increased amount.

In the event, however, that 65% of the memberships are not sold to veterans, or an increase in the FNMA commitments is not allowed, then the loans and our project analyses will have to be revised inasmuch as they have been set up on the basis of the maximum loans being made.

Although commitment contracts were not approved at this time for the Fourteenth and Fifteenth Charleston Park Mutual Homes, Inc. projects in Las Vegas, Boyar feels confident that we will be able to pick up said commitments before the loans are insured and saleable. Further, Weingart and Boyar have agreed that if said commitments are not obtained, they will personally guarantee to either find us an approved mortgagee to buy these loans at par within six months after they are insured, or to stand any discount necessary in order to sell the loans. * * *

On September 14, 1953, at the same time that 15 of the petitioner corporations were organized, 15 corporations named First Charleston Park Mutual Homes, Inc., through Fifteenth Charleston Park Mutual Homes, Inc., were organized under the laws of Nevada. Each was authorized to issue common stock class A and class B to the total of 19 shares. On April 19, 1954, at the time Calvada was organized, a corporation named Sixteenth Charleston Park Mutual Homes, Inc., was organized. This corporation was authorized to issue 30 shares of common stock. The directors of the 16 numbered corporations, herein sometimes referred to as the mutuals, were L. B. Harbour, Jr., James

Gross, C. C. Roark, James R. Reid, and Bernard Boyar. Each of the mutuals was also authorized to issue 100 shares of $1 par value preferred stock, all of which was issued to the Federal Housing Administrator.

In October 1953, 15 commercial checking accounts were opened in a Los Angeles bank in the names of the first 15 petitioners and in the amount of $5,000 each. A similar account in the name of Calvada was opened on May 4, 1954.

The directors of Nevada Western Projects Corp. on October 7, 1953, voted to enter into separate written joint venture agreements with each of the first 15 of the petitioners, each joint venture to be designated as the corresponding Projects Co.

Pursuant to such authorization, Nevada Western entered into separate written agreements designated as joint venture agreements with the petitioners, except Calvada. The agreement with Benmar was dated October 14, 1953, and provided, in part:

WHEREAS, there has been organized and is existing FIRST CHARLESTON PARK MUTUAL HOMES, INC., a Nevada corporation, hereinafter sometimes referred to as the "Mutual," which is a cooperative corporation under the provisions of Section 213 of the National Housing Act, as amended, and which has been organized for the purpose of constructing a single dwelling house and appurtenances on each of nineteen (19) lots situated in the City of Las Vegas, County of Clark, State of Nevada, which lots are hereinafter sometimes referred to as the "premises,"

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1. The name of this joint venture shall be BENMAR PROJECTS CO., sometimes hereinafter referred to as the "joint venture."

2. The business to be conducted shall be that of general contractor for the purpose of entering into and performing a lump sum contract for the construction of dwelling houses upon and the improvement of the premises for the Mutual. The joint venture may enter into and perform any contracts incidental or pertaining to the construction mentioned above and may otherwise purchase, acquire, use or own such real and personal property as may appear to be essential or desirable in connection with such contract. It may obligate itself to pay for and dispose of any property acquired by it and may borrow money to secure the payment of its debts and do any and all those things relating to the obtaining of and entering into such contract and the performance thereof. The joint venture may encumber and dispose of its property and do any and all of those things which a natural person might do in entering into and performing such contract and in the acquisition of such property, the borrowing of money, securing the payment thereof and encumbering and disposition of its property. It may undertake the payment of any obligation of the Mutual for the acquisition of property or for any other purpose incidental to the acquisition or performance of said lump sum construction contract.

  *   *   *   *   *   *   *

5. The total amount of cash to be contributed to the joint venture shall be Eight Thousand Dollars ($8,000.00), of which one-half (½) shall be contributed by Benmar and one-half (½) by Nevada. Each of the joint venturers shall make such contribution at the time of signing this Agreement.

6. Nevada does hereby agree and undertake to loan or procure a loan or loans to be made to the joint venture in an aggregate amount of not less than Sixteen Thousand Dollars ($16,000.00). Such loan or loans shall be evidenced by the promissory note or notes of the joint venture, unsecured, providing for interest at the rate of five percent (5%) per annum, all payable on or before February 1, 1955.

7. Benmar does hereby agree and undertake to cause all available memberships of the Mutual to be sold and issued to qualified residents of the State of Nevada at the earliest practicable date. Neither the sale nor offering for sale of any such memberships shall be an activity or responsibility of the joint venture or of Nevada, but the cost and expense of such sales transaction in the agreed amount of Two Hundred Forty Dollars ($240.00) per lot, or a total of Four Thousand Five Hundred Sixty Dollars ($4,560.00), shall be deemed a cost and expense of the joint venture.

\* \* \* \* \* \* \*

9. Subject to any exceptions or limitations provided elsewhere in this Agreement, the rights and duties of the joint venturers in relation to the joint venture shall be determined by the following rules:

(a) Each joint venturer shall be repaid in order of priority as follows:

(i) Preliminary costs;

(ii) All loans made by joint venturer to the joint venture, together with interest thereon;

(iii) The contribution to capital of the joint venture made by each joint venturer as required by paragraph 5 of this Agreement;

(b) After payment or provision for payment of the debts and obligations of the joint venture, including the items described in (a) above, the joint venturers shall share in the profits of the joint venture as follows:

(i) Thirty-three percent (33%) to Benmar;

(ii) Sixty-seven percent (67%) to Nevada;

(c) In the event of losses of the joint venture, each joint venturer shall contribute in the same proportion as provided above for the sharing of profits;

The foregoing agreement as drafted provided for sharing profits with 57½ percent to Benmar and 42½ percent to Nevada. These figures were changed to 33 percent and 67 percent, respectively.

The agreements between Nevada Western and the other petitioners, except Calvada, contained similar terms.

On October 14, 1953, Weingart and L. H. Boyar gave IDS a written guaranty to provide purchasers for the individual mortgage loans resulting from the project involving Fourteenth and Fifteenth Charleston Park Mutual Homes, Inc. These aggregated $459,800.

On December 15, 1953, Weingart and L. H. Boyar wrote Western Projects Corp. as follows:

Gentlemen:

Under date of August 31, 1953 we proposed and you agreed to a joint venture with your company or its nominee relating to the acquisition of land in Las Vegas, Nevada and fifteen additional joint ventures for the construction of single dwelling houses for cooperative corporations.

In paragraph numbered 7 in that letter, we estimated that 42½% of the profits would provide you a cash profit of $464,210.00 and that you would have a 42½% interest in fifty-seven remaining lots at a cost to you of $17,345.00.

You will recall that a very short time was available to us for making our preliminary estimates; that we had not previously engaged in construction in the Las Vegas area; and that we specified in our proposal of August 31st that there would be no guarantee of profits resulting from the joint ventures.

We now have bids on substantially all of the construction items which we reviewed with you this morning and we are in a position to form a more accurate estimate of construction costs which will be substantially greater than the amount of our original estimate. As a result of our revised estimate, we suggested to your representatives, Messrs. Bonham, Foresman, and Young, that the fifteen construction joint ventures with your company's nominee provide that the share of the profits to your nominee be 67% and that of our nominee 33% with respect to the construction joint ventures, and we are now prepared to sign the fifteen joint venture agreements with your nominee corporation on that basis.

It is to be understood, however, that this arrangement does not effect any change in the proportionate interests in the fifty-seven lots which will remain, and as to those lots your total interest will be 42½% and our total interest 57½%. It is to be understood, also, that we make no representation or warranty as to the amount of profits of any of the joint ventures.

Will you please sign and return to us the enclosed copy of this letter to confirm the arrangement as outlined above.

This proposal was accepted on behalf of Western.

The articles of incorporation of the mutuals stated the purposes of the corporation as including a corporation to provide housing to be regulated by the Federal Housing Commissioner as to sales, charges, capital structure, and methods of operation, all pursuant to the provisions of section 213 of title II of the National Housing Act, as amended, and to apply to that commissioner for mortgage insurance under such section 213. Each share of common stock was to be appurtenant to one of the single family residences to be completed on property to be owned by the corporation, and when all were completed each stockholder was to have the right to purchase the residence to which his certificate was appurtenant.

Each of the mutuals entered into a prime contract with one of the joint ventures for the construction of dwelling units and off-site improvements. The joint ventures entered into subcontracts with Equitable Service Co., herein referred to as Equitable, for the construction. Equitable was a California corporation organized in 1952 with 2,500 shares of common stock, Weingart owned 875 shares, Mark Boyar 625, Louis H. Boyar 250, Rothberg 250, and other persons 500 shares. Equitable had equipment and hired the necessary employees to perform the work required. Some of the work was subcontracted to local contractors. Construction proceeded in a sequence originally planned so as to complete a group of houses for one mutual before the next group was completed.

The sales program of the development was under the direction of Rothberg, who performed the duties of sales manager for Equitable without fee. Rothberg prepared the advertising for the entire development and supervised the salesmen. Purchasers were informed that they would have to wait several months before the houses would be ready for occupancy. The promoters tried to get each mutual sold completely, in sequence, in order to start construction of the houses in that mutual.

Weingart, acting for the promoters and the lender, agreed with the city of Las Vegas to install the necessary off-site improvements, including streets, curbs, sewers, sidewalks, water, and street lighting, and gave bonds to guarantee completion thereof in the total amount of $286,793.17.

In January 1954, 15 documents entitled "Certificate of Business under Fictitious Name" were recorded in Clark County, Nev. Each of these represented that one of the petitioners (other than Calvada) and Nevada Western were conducting business as copartners under a fictitious name. This name used the name of the petitioner and the words "Projects Co.," such as, for example, "Kessmar Projects Co." A similar document with respect to Calvada was recorded in April or May 1954. The agreements between each petitioner and Nevada Western are referred to herein as the joint ventures.

In January 1954 Weingart executed deeds to the mutuals numbered First to Fifteenth, conveying to each of those corporations 19 lots in Charleston Park. These deeds were recorded on January 7, 1954. A deed conveying 30 lots to the Sixteenth mutual was recorded on June 17, 1954.

At the time Weingart gave deeds to the mutuals, contracts were made between Weingart, as grantor, the mutual, as vendee, and one of the joint ventures, as grantor's assignee, of which the following is an example:

WHEREAS, Grantor is the holder of title to real property in the city of Las Vegas, County of Clark, State of Nevada, hereinafter referred to as "the premises," which is more fully described in the exhibit hereto attached marked Exhibit "A," and by this reference made a part hereof, and

WHEREAS, Vendee desires to purchase the premises upon the terms and conditions hereinafter provided and will improve the same with the proceeds of a loan to be made to Vendee by Investors Diversified Services, Inc. and insured under the provisions of Section 213 of the National Housing Acts, as amended,

NOW, THEREFORE, IT IS AGREED:

1. That Grantor immediately will execute and deliver to Vendee a grant deed conveying to Vendee the title to said premises subject to taxes, liens, encumbrances, covenants, conditions, restrictions, easements, reservations, rights and rights-of-way of record.

2. That on or before sixty (60) days from the date of this Agreement Vendee will pay to BENMAR PROJECTS CO., as Grantor's Assignee, Twenty Four

Thousand Two Hundred Seventy One Dollars ($24,271.00), which shall constitute the full purchase price of the premises.

3. Grantor does hereby assign, transfer and set over unto Grantor's Assignee all of the right, title and interest of Grantor to receive and receipt for the purchase price of the premises hereinabove set out, and Grantor's Assignee does hereby accept such assignment.

4. In the event that Vendee shall receive any proceeds of the loan referred to above before said purchase price shall have been fully paid, Vendee shall pay over to Grantor's Assignee and does hereby assign to Grantor's Assignee the proceeds of said loan to the extent required to pay said purchase price in full.

In general, a cooperative or mutual sales type housing project pursuant to section 213 of the National Housing Act, as amended, was carried out in the following manner, although not necessarily in the order stated. A sponsor or promoter arranged to acquire land and with the lender applied to the FHA for a commitment for insurance under section 213. A nonprofit corporation was formed under State law. This corporation, the mutual, or cooperative, issued preferred stock to the FHA and common stock representing the houses to be built. These common shares were sold to individuals desiring to acquire a house for the price of a downpayment and entitled the shareholder to the particular house represented by the share. The buyer must be approved by FHA as to credit. The mutual acquired the land, obtained a blanket loan from the lender which was insured by FHA, and contracted for construction of houses and off-site improvements. When the houses were completed, each buyer surrendered his stock, acquired title to his house, and could borrow the remainder of the purchase price from the lender under a separate mortgage insured by FHA. The house was then released from the blanket mortgage.

A purchaser desiring to buy a house in the development signed a subscription and purchase agreement, subscribing for membership in one of the mutuals and for 1 share of common stock. The agreement stated that the corporation would undertake construction of the project; that it would be financed in part by a private lending institution which would apply to the FHA for insurance in accordance with the provisions of section 213 of the National Housing Act; and that upon completion of construction and surrender of the stock the dwelling would be conveyed to the subscriber who might have his individual mortgage insured by the FHA. Each applicant was furnished an information bulletin in a form approved by the FHA, stating in part:

1. SCOPE OF THIS BULLETIN.

Participation in a cooperative housing project carries with it duties and responsibilities as well as rights and privileges, and you are therefore entitled to all pertinent information concerning the project. This Bulletin is intended to

provide such general information as is not contained in the Articles of Incorporation, By-Laws and Subscription and Purchase Agreement, copies of which you have received.

The Subscription and Purchase Agreement sets forth the terms and conditions under which you have applied for stock ownership in the cooperative and agreed to purchase a dwelling unit, and the Certificate of Incorporation and By-Laws set forth the authority and methods of operation of the cooperative corporation. It is urged that you read these documents.

2. STOCK OWNERSHIP.

The corporation has been incorporated as a nonprofit housing corporation for the purpose of construction of homes for the members of the corporation. Each member of the corporation, regardless of the dollar amount of his investment, will have one vote. The affairs of the corporation will be conducted by a Board of Directors elected by the membership as provided in the By-Laws. * * *

\*       \*       \*       \*       \*       \*       \*

4. FUNCTION OF FHA IN CONNECTION WITH THIS PROJECT.

It is the function of the FHA to insure the lending institution which makes the loan to the corporation to construct the project against loss by reason of default of the corporation in its obligations under the mortgage, and the FHA as insurer of such mortgage loan does not insure a member of the corporation against loss or against defaults by the corporation. While the FHA is authorized to furnish technical advice and assistance to sponsoring groups in the organization of nonprofit corporations and in the planning, development, construction, and operation of such housing projects, the FHA does not select the contractor, and is not a party to the construction contract.

Neither is the FHA authorized to act as the architect of the corporation. The FHA as insurer of the mortgage loan for which the project is the security will assign inspectors for the purpose of determining that the security is an acceptable risk for the insurance liability assumed under the insurance contract with the lending institution. The corporation as owner of the project represents all the member stockholders, and the rights of the members as stockholders will be governed by the provisions of the charter and the by-laws. While the local FHA office will gladly furnish advice and assistance to groups proposing to form or having formed cooperative housing corporations, such advice and assistance are of an advisory nature only and the determination of the final action taken is the responsibility of the corporation. The amounts paid by an applicant for his stock subscription will be handled in accordance with the provisions of the Subscription Agreement and By-Laws, and such funds will not be deposited with or be otherwise under the control of the FHA.

The funds used by the mutuals for acquisition of lots and construction of houses were derived from amounts obtained from sale of common stock of the mutuals which amounts aggregated $328,452 and loans from IDS amounting to $3,842,250. The borrowed funds were insured by the Federal Housing Administration under section 213 of title II of the National Housing Act, as amended. Each of the mutuals executed a building loan agreement with IDS, a promissory note and a deed of trust as security for the loan. The deeds and notes were recorded.

A separate building permit was issued by the city of Las Vegas for each of the 315 houses constructed in Charleston Park. These were applied for by and issued to the joint venture contracting to build on the designated lot. Applications were made in sequence beginning December 23, 1953, until February 2, 1954, in groups, except that in the case of Calvada Projects Co. the application was made in June 1954.

Between July 6, 1954, and October 27, 1954, notices of completion were recorded pertaining to the completion of the houses on the lots which had been transferred to 16 mutuals.

Equitable Service Co. performed the construction supervision for a flat fee of $300 per house and the sales for a flat fee of $240 per house. This corporation continued in business after the taxable periods and performed contracts for organizations outside the promoters' group. Subcontracts were let for performance of some of the work, such as cement work and plumbing and heating. Contract prices were based upon the assumption that 285 houses would be built, although the contracts carried a clause permitting the builders to stop at any point without liability for work not performed. The contractor undertaking to build foundations erected a cement plant on one of the tracts on the assumption that he would construct foundations for 285 houses.

The original plan was to build 285 houses and to hold 57 remaining lots. After the project had progressed favorably it was agreed to build on 30 of the remaining lots and have a park site. Of the cost of the land, $242,689.20, the amount of $227,877.86 was allotted to the 315 lots and $14,811.34 to the park site. The 315 lots were transferred to the mutuals for $380,141, which amount was to be paid by the mutuals to the joint ventures. This was based upon the FHA appraisal and allowance for cost of land, and under the agreements any unused part of that allowance was to accrue to the benefit of the contractor, the joint venture. The FHA allowance was in excess of the actual cost to the promoters.

In negotiating construction subcontracts, the promoters explained to the subcontractor that the 285-house project would be divided into 15 mutual units and each unit would be built by a different contracting company, all under the promoters' control. Therefore, a separate written contract would be made for each unit. Also, the subcontractor was given the construction sequence and told which contractor was to be invoiced for each unit.

The petitioners had no employees and owned no construction equipment or other depreciable assets.

The directors of the mutuals were relatives of one or another of the promoters or employees of one of the corporations controlled by the promoters.

The memberships of some mutuals were sold completely prior to the sale of all memberships of others scheduled for building earlier, but the planned sequence of construction was adhered to and was not altered as a consequence of the actual order of sales.

The subdivision was advertised as a unit under the name "Charleston Park." The names of the petitioners did not appear in the advertising. The first 285 houses were offered for sale at the same time.

The first 15 joint ventures were all capitalized in January 1954 with each joint venturer making a capital contribution of $4,000, and with Western Projects Corp. making a $16,000 loan to each. In the case of Calvada Projects Co., the loan from Western Projects was $27,000, and the capital contributions were $4,000 each from Nevada and Calvada.

The joint ventures contracted to construct the houses for a lump-sum price and to build the off-site improvements for another lump sum. Calvada Projects Co. contracted to build 30 houses for $327,182 and to construct the related off-site improvements for $33,046. The other joint ventures contracted to build 19 houses each for specified amounts ranging from $189,107 to $193,956 and to construct off-site improvements for amounts ranging from $19,429 to $22,742.

Weingart and L. H. Boyar signed indemnity agreements on an FHA form as sureties for each joint venture in favor of each of the mutuals and IDS to guarantee the performance by the joint venture of the construction contracts and save harmless the obligees from loss or damage from failure to do so. They assumed this liability to the extent of 10 percent of the contract price.

The joint venture agreement between Calvada and Nevada Western was dated May 3, 1954, and provided for sharing of profits or losses at the rate of 50 percent to each party.

In a single supplemental agreement dated November 3, 1954, between Nevada Western and all of the petitioners, the profit or loss ratios of 67 percent and 33 percent recited in the earlier contract were amended to provide for a sharing of profits or losses of 50 percent to each party.

Each of the joint ventures filed a partnership return of income, Form 1065, with the district director of internal revenue at Reno, covering the taxable period ended September 30, 1954, except that the return filed for Calvada Projects Co. covered a period ended December 31, 1954. Each of the joint ventures filed a Form 1065 for a taxable period ended June 30, 1955, which was marked as a final return.

Gain on the sale of lots was reported on the aforementioned Forms 1065 for the periods ended in 1954 as follows:

| Form 1065 filed in the name of— | Reported sales price | Reported cost | Gain |
|---|---|---|---|
| Benmar Projects Co | $24,271 | $13,713.45 | $10,557.55 |
| Marboy Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Rothmar Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Harben Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Loumark Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Kessmar Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Gart Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Harlo Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Barjim Projects Co | 24,271 | 13,713.45 | 10,557.55 |
| Texlar Projects Co | 20,958 | 13,713.45 | 7,244.55 |
| Hillred Projects Co | 20,958 | 13,713.45 | 7,244.55 |
| B-L-M Projects Co | 20,958 | 13,713.45 | 7,244.55 |
| Nevcal Projects Co | 20,958 | 13,713.45 | 7,244.55 |
| W-R-B Projects Co | 20,958 | 13,713.45 | 7,244.55 |
| Evalar Projects Co | 20,958 | 13,713.45 | 7,244.55 |
| Calvada Projects Co | 35,954 | 22,176.11 | 13,777.89 |

In January 1955 each of the petitioners, except Calvada, filed a certificate of voluntary dissolution with the secretary of state of the State of Nevada. Calvada filed such a certificate in May 1955.

The checking accounts of all the petitioners were closed in July 1955.

By January 21, 1955, all loans made to the joint ventures by or for IDS had been repaid. No withdrawals of profits were made by any of the joint venturers prior to that date.

The 16 joint ventures reported a profit of $634,694.51 from the Charleston Park project. The petitioners' share of this was $322,039.74 which was reported on their returns for the fiscal period ended July 31, 1955. These returns were marked as final returns. Calvada reported net income of $27,839.87. Each of the other petitioners reported an amount ranging from $16,188.20 to $19,379.59.

The development of the Charleston Park subdivision was an integral business venture. No real or substantial business or economic purpose was served by the use of the 16 petitioner corporations instead of 1 as the representative of the promoters in the promoters' association with IDS in this enterprise. The principal purpose of the promoters in forming the 16 petitioner corporations instead of 1 was the avoidance or evasion of income taxes through the securing of tax benefits which the promoters otherwise would not have enjoyed. The apportionment or allocation of a single surtax exemption among the petitioners pursuant to sections 269 and 482 of the Internal Revenue Code of 1954 was necessary to prevent avoidance or evasion of taxes.

### OPINION.

The respondent determined that the 16 petitioner corporations were part of a single integrated business enterprise and that a single minimum surtax exemption of $25,000 was allocable among them in equal amounts, in accordance with sections 269, 482, and 1551, and

other applicable provisions of the Internal Revenue Code of 1954. The petitioners state that the issue is whether the respondent is authorized to disallow the full surtax exemption to each corporation and thereafter attempt to allocate one exemption among them.

The stockholders of these corporations, Weingart, Rothberg, and Louis and Mark Royar, promoted the construction of a subdivision of single-family dwellings, originally 285 in number, ultimately 315. They chose to carry out the project through the use of the 16 petitioners. All except 1 of these reported less than $25,000 as net income in its return for the taxable period ended July 31, 1955. The respondent takes the position that the project could have been carried out through a single corporation instead of 16 and that the use of 16 was for the principal purpose of evasion or avoidance of Federal income tax by securing 16 surtax exemptions instead of 1. The petitioners contend that the use of the several corporations was principally for good and sufficient business and economic reasons and not for the purpose of tax avoidance.

Section 269 of the Internal Revenue Code of 1954 [2] relates to acquisitions of control of corporations where the principal purpose of such acquisition was evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance not otherwise available to the persons acquiring such control. Subsection (a) provides for the disallowance in full of the tax benefit sought by the tax avoidance device, and subsection (b) authorizes the allowance of such part of the deduction, credit, or other allowance as will not result in the avoidance of the tax sought to be avoided by the acquisi-

---

[2] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

(b) POWER OF SECRETARY OR HIS DELEGATE TO ALLOW DEDUCTION, ETC., IN PART.—In any case to which subsection (a) applies the Secretary or his delegate is authorized—

(1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or

(2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made; or

(3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).

tion. Also section 482 of the Internal Revenue Code of 1954 [3] authorizes the respondent to apportion or allocate credits or allowances between or among two or more organizations owned by the same interests if this is necessary to prevent evasion of taxes. These provisions would support the respondent's determination if evasion of taxes is involved. Section 269 (formerly section 129 of the 1939 Code) supplements section 482 (formerly section 45 of the 1939 Code). See H. Rept. No. 871, 78th Cong., 1st Sess., 1944 C.B. 938–939; S. Rept. No. 627, 78th Cong., 1st Sess., 1944 C.B. 1016–1018. The respondent is not urging the application of section 1551.

The petitioners contend that "acquisition" of control, as used in section 269, does not include formation of new corporations. It has been held otherwise. See *Concord Supply Corporation*, 37 T.C. 919 (1962); *James Realty Co.* v. *United States*, 280 F. 2d 394 (C.A. 8, 1960); *Commissioner* v. *British Motor Car Distributors, Ltd.*, 278 F. 2d 392 (C.A. 9, 1960), reversing 31 T.C. 437; *Thomas E. Snyder Sons Co.* v. *Commissioner*, 288 F. 2d 36 (C.A. 7, 1961), affirming 34 T.C. 400; and *Coastal Oil Storage Co.* v. *Commissioner*, 242 F. 2d 396 (C.A. 4, 1957), modifying 25 T.C. 1304.

It is clear that the promoters organized and by their stockholdings acquired control of the petitioner corporations, and that forming 16 corporations instead of 1 would have the effect of making available to them the benefit of a number of surtax exemptions which they would not otherwise have enjoyed. The question remains whether the principal purpose for this arrangement was the evasion or avoidance of income taxes as the respondent contends or the accomplishment of a business objective as the promoters allege.

The promoters had previously been associated with the same lending organization, Investors Diversified Services, Inc., herein referred to as IDS, in constructing housing in the Los Angeles area. The promoters looked into the possibilities of constructing housing in Las Vegas and held discussions with representatives of IDS, in June, July, and August 1953, concerning an association for this purpose in which the promoters would undertake to acquire and subdivide land and construct and sell housing, and IDS would advance the necessary funds. There is testimony to the effect that both the promoters and the lender had some fears that housing might be difficult to sell in Las Vegas because of the supposed instability of the population of a place where the principal industries were gambling and hotels. On the other hand,

---

[3] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

there is testimony of a great need for housing there. The outcome was that all the 285 houses originally projected were sold, as well as 30 others started later, but that many of the original purchasers withdrew before completion and it was necessary to resell their houses and that over 700 sales were required to dispose of 315 houses.

The Public Housing Act of 1950, 64 Stat. 54, by section 114, amended the National Housing Act by adding a new section 213,[4] which is codified as 12 U.S.C. sec. 1715e. This section authorized the Federal Housing Commissioner to insure certain mortgages including mortgages covering property held by a nonprofit corporation organized for the purpose of construction of homes for the members. The related regulations were title 24, C.F.R., part 241. Section 241.3 of these regulations authorized the filing of an application for mortgage insurance by an approved mortgagee and by the sponsors of a project. Provision was made in the regulations for issuance of preferred stock to the Federal Housing Commissioner and other stock as acceptable to that Commissioner. Building standards must be satisfactory to the FHA, which is empowered to regulate mortgagors as to rents, sales, charges, capital structure, rate of return, and methods of operation. Many of the contract forms were prescribed, and the form of subscription and purchase agreement signed by the buyer and the information bulletin furnished to applicants were approved, by the FHA.

The promoters had had some prior experience in building houses with a view to insuring the mortgages under the provisions of section 213 and in dealing with the FHA. They were aware that some amount of turnover of buyers was inevitable in the arrangement under which a nonprofit cooperative corporation or mutual must sell all its memberships before commencing construction and thus require the purchasers to wait several months before being able to occupy the houses contracted for. The promoters and the lender therefore agreed upon a plan of using several mutuals with a limited number of memberships each to sell and houses to build. This would permit building all the houses in a small group as soon as all the memberships in the group were sold without waiting for the rest of the entire project to be sold before any construction began. This plan would permit the promot-

---

[4] Sec. 213.

(a) In addition to mortgages insured under section 207 of this title, the Commissioner is authorized to insure mortgages as defined in section 207(a) of this title (including advances on such mortgages during construction) which cover property held by—

   (1) a nonprofit cooperative ownership housing corporation or nonprofit cooperative housing trust, the permanent occupancy of the dwellings of which is restricted to members of such corporation or to beneficiaries of such trust; or

   (2) a nonprofit corporation or nonprofit trust organized for the purpose of construction of homes for members of the corporation or for beneficiaries of the trust;

which corporations or trusts are regulated or restricted for the purposes and in the manner provided in paragraphs numbered (1) and (2) of subsection (b) of section 207 of this title.

ers and the lender to stop at a convenient point short of completion of the entire project if costs became too great or sales could not be made, and both parties could thus avoid a large loss. This was a reasonable business purpose for the adoption of the arrangement for some 15 or 16 mutual corporations with a relatively small number of members.

However, even though the 16 mutual corporations, First Charleston Park Mutual Homes, Inc., etc., may have been appropriate to facilitate sales and construction of the houses in small groups, that does not establish that the promoters needed the 16 petitioner corporations instead of 1 to represent them in their participation in the project. The lender, IDS, created only 1 corporation, Nevada Western, as its representative. If the promoters had formed 1 corporation as their representative and this 1 had formed a single joint venture with Nevada Western, the joint venture could have contracted with the 16 mutuals for construction of the houses, the profits would have been divided between the two joint venturers, the promoters' corporation's share would be reportable for tax purposes by 1 corporation instead of 16, and only one minimum surtax exemption would have been available to the promoters' representative.

It is evident that the construction of the subdivision was a single venture and not 16 different businesses. The land was acquired in two parcels from two sellers, but the promoters represented the development to the city as a single project of 285 houses and contracted with the city to install the necessary off-site improvements on the project as a unit. Some of the costs pertaining to the entire development were apportioned among the joint ventures. Contracts with the engineer and the various subcontractors were negotiated on the basis of a subdivision of 285 houses, not separately as to each group of 19 houses, although the subcontractors were to bill the joint ventures separately. The promoters do not dispute this, but maintain that there were good and sufficient economic and business reasons for forming at first 15 petitioner corporations and joint ventures, and later a 16th.

They explain the election to use a number of corporations instead of one substantially as follows: IDS was to lend $285,000 plus a capital contribution of $15,000; the promoters were to contribute $15,000 in capital. IDS desired repayment of its loan prior to the withdrawal of capital or profits. The promoters had two alternatives. One was to use a single entity in a joint venture with IDS or its nominee, in which case (1) they would risk $15,000, (2) the loan of $285,000 would have to be repaid before any profits could be withdrawn, (3) profits earned on a part of the venture could be swept away by losses incurred in later parts, and (4) all profits would be subject to repayment of the loans and capital provided by IDS. The other alterna-

tive was to form 15 separate joint ventures with 15 entities (later a 16th) each to be a contracting entity for one of the mutuals in which (1) they risked $1,000 (under the initial plan) with each mutual, (2) the profits of each separate venture were available on repayment to IDS of only $19,000 plus $1,000 capital, (3) the subsequent success or failure of another part of the project would not affect these profits, and (4) profits were not subject to repayment of the loans made to the other joint ventures.

The promoters contend that therefore it made a substantial difference to them whether the subdivision was contracted for by one joint venture or several, and that in the latter case the profits of one would not be affected by losses on others.

The case of *Aldon Homes, Inc.*, 33 T.C. 582 (1959), involved the construction of a housing development on a tract of land in California. In that case, as here, there was an investing group and a management group, and a separate corporation owned by the managers served as general contractor. In both cases the houses were constructed on a mass production basis with the work proceeding lot by lot in a planned sequence, the contractors were told which corporations to bill for the materials and work done on individual houses, and the development was advertised as a unit. The managers in the *Aldon Homes* case organized 16 corporations, referred to as the alphabet corporations, and divided the lots among them. These corporations reported the profits on the entire tract. In that case we held that the alphabet corporations were not organized for any purpose other than obtaining tax benefits, that they did not carry on the business activities which earned the profits, nor any substantial business activities, and did not earn the income from the development, and that they were shams and should be disregarded. We pointed out that holding corporate meetings, adopting bylaws, electing officers, keeping separate books, and issuing stock were not substantive income-producing activities, that the development was a single transaction with every step taken by the controlling stockholders, and that these stockholders controlled the distribution of the profits from the venture. We sustained the respondent in imputing the combined net income of the 16 corporations to Aldon, pursuant to section 22(a), I.R.C. 1939. See also *Shaw Construction Co.*, 35 T.C. 1102 (1961), on appeal (C.A. 9); and *James Realty Co.*, *supra*.

The promoters in the present case argue that the presence of IDS as an independent party distinguishes the present situation from *Aldon Homes* and similar cases where a single controlling person or group formed several corporations to carry out a function which could be performed by one.

We are not persuaded that the relationship of the promoters to IDS was as distant as they would have it appear. They had been

associated in prior building ventures, and IDS regarded the promoters as competent and the association as desirable and potentially profitable. This corporation had more than a lender's interest in the arrangement as it was to share in the profits. The first proposal was to allow 25 percent of the profits to IDS. After the agreement of August 31, 1953, had been signed on a basis of sharing profits with 42½ percent going to IDS, the promoters in December 1953 agreed to revise this and allow IDS to have 67 percent. There is no explanation except that costs appeared to be higher than originally estimated. Still later, in November 1954, the parties revised the shares of profits to allow 50 percent to each. It would appear that the contracts were not to be rigidly followed and that IDS had a considerable influence in the venture.

Although the promoters contend that the several joint ventures were formed at the request of IDS and that the lender might not have participated if this method had not been adopted, there is no evidence of such a request or demand, no showing of any reasons therefor, and no satisfactory evidence that IDS would not have participated if this method had not been followed. The testimony of Farr, who drafted the agreements between IDS and the promoters, on this point is vague and does not support the contention. Farr said IDS wanted a contractor not otherwise involved creditwise, but there would have been no outside credit involvement if only 1 corporation had been used instead of 16. There is no indication that FHA would not have approved the arrangement if one corporation had represented the promoters. The actual construction was done by Equitable and there was no challenge as to its credit although it had been involved in prior outside contracts and continued in business following this project. If the parties wished to stop building at a point short of completing the entire project, that could be managed through the mutuals and did not require separate joint ventures or separate corporations representing the promoters. Farr is said to have represented IDS but his fee was paid by the joint ventures and therefore in part by the promoters. He indicated that the arrangement had been used before. If it had saved taxes in the earlier case it is likely he would use it again in drafting the contracts in this instance.

When Western Projects Corp. remitted $242,689.20 to Weingart to cover the land purchase price it was agreed that the payment was a loan and that all the joint venturers, including Weingart and L. H. Boyar, were liable for repayment of the loan with interest at 5 percent, and that all funds received from the sale of the real property were to be used to the extent required to repay the loan. Weingart, on behalf of the joint venturers, agreed with the city of Las Vegas to install at his expense the complete off-site improvements and gave bonds in the amount of $286,793.17 to guarantee completion thereof. In

October 1953 Weingart and L. H. Boyar guaranteed to IDS that if FNMA did not take the mortgages on the loans concerning the 14th and 15th mutuals, aggregating $459,800, they would find an approved purchaser or stand any discount necessary to sell them. Weingart and L. H. Boyar also, as sureties, personally guaranteed to each mutual and to IDS the full performance by each joint venture of the construction contracts, accepting liability for any loss to the extent of 10 percent of the contract price. The liability so assumed was in excess of $300,000. The guaranties and assurances of Weingart or L. H. Boyar, or both of them, were presumably given on behalf of all four of the promoters.

The promoters, having obligated themselves to the city of Las Vegas for off-site improvements and to IDS to insure against losses on account of the land or from difficulty of selling the mortgages or from full performance of all construction contracts, were not in a position to limit their liabilities or save their profits on any one joint venture against losses resulting in others through the use of several corporations, rather than one, as their representative in the project. If profits were realized from the first few groups of houses built, the promoters would have no way to save these in the event the next groups were unsalable and resulted in losses. They could reduce losses by stopping construction, but the profits they had realized would still be subject to their personal liabilities for those losses. In view of their close relationship with the lender, there is no reason to suppose that to avoid their personal liabilities they would take advantage of the corporate shield which they had erected in the different petitioner corporations, as the argument assumes.

In these circumstances there is no merit in the promoters' argument that they had good and sufficient business and economic reasons for using 16 corporations. The petitioners have not met the burden of proving that the respondent's determination was erroneous.

*Decisions will be entered for the respondent.*