## CITY TITLE INS. CO. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 18.

Circuit Court of Appeals, Second Circuit.

Jan. 3, 1946.

Henry Halpern, of Brooklyn, N. Y., for petitioner-appellant.

Samuel O. Clark, Jr., of Washington, D. C. (Sewall Key, Robert N. Anderson, and Morton K. Rothschild, all of Washington, D. C., of counsel), for appellee.

Albert S. Willey, of Rochester, N. Y., amicus curiae.

Before SWAN, CHASE, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

The revenue statute expressly provides, in sections 202 and 203, 26 U.S.C.A. Int. Rev.Code, that, as to certain insurance companies, percentages of certain reserve funds, including some required by a state statute, may be deducted from gross income. No similar deduction is referred to in § 204, which governs here. Consequently, the existence of a reserve or the mere fact that it was required by a state statute, cannot justify the deduction taxpayer claimed. The sole issue here, then, is whether the sums set apart in the reserve are "unearned premiums."

The Commissioner urges that we should hold that premiums of title companies are earned when received, so that no reserve, whether or not required by state statute, can consist of deductible "unearned premiums." Cf. American Title Co. v. Commissioner, 3 Cir., 76 F.2d 332. We need not decide that question. For we shall assume, arguendo, that Early v. Lawyers Title Ins. Co., 4 Cir., 132 F.2d 42 is correct and, if apposite here, would, as taxpayer asserts, lead to reversal. In the Early case, the court had before it a Virginia statute which required that portions of premiums be set aside "initially" in a reserve and should "at all times and for all purposes be considered and constitute unearned portions of the original premiums"; but the statute also provided that the reserve, as to insurance contracts, "for a fixed time" should be reduced at stated periods and, "If not for a fixed time, then a risk shall be deemed to have been written * * * for twenty years from the date of the contract * * *."[1] The Fourth Circuit, in the Early case, held that sums while in this reserve were "unearned

---

[1] The Virginia statute, Code 1942, § 4325a(e), reads:

"On any contract of title insurance, hereafter issued by a domestic title insurance company, there shall be reserved initially a sum equal to ten per centum of the original premium, whether or not the risk shall be for a fixed time. If for a fixed time, then at the end of each year for the first five years, there shall be a reduction in the sum reserved of one per centum of the original premium, and thereafter at the end of each year of the remainder of said time a reduction of a pro rata portion of the remaining five per centum thereof, except that if the risk is of a mortgage, trustee in a deed of trust to secure debt, or creditor secured thereby, no reduction shall

be made that will decrease the sum reserved below five per centum of the original premium, until the expiration of the time of the risk. If not for a fixed time, then a risk shall be deemed to have been written, if of an owner of property, or any interest therein, for twenty years from the date of the contract and if of a mortgagee, trustees in a deed of trust to secure debt, or creditor secured thereby, for a time expiring three years after the final maturity of the debt as stated in the mortgage or deed of trust, or for twenty years from the date of the contract, whichever time shall be longer. On any contract of title insurance heretofore issued, a reserve shall be set up and hereafter maintained, in such sum as would have been required if

premiums" and deductible as such under § 204.

■ Funds in that reserve were plainly to be held but for a limited period, after which they were released and then became "free assets," i. e., "earned premiums" subject to the federal tax. But no one can tell whether the funds in the reserve prescribed by subsection 1(a) of § 434 of the New York statute will ever be released and become "free assets."[2] The New York statute thus in this respect differs so substantially from the Virginia statute that the Early case is not apposite. Moreover, the New York statute does not explicitly state that the sums in the reserve should "constitute unearned portions of the original premiums." While such a statement in a state statute would not alone suffice to convert a reserve into one of unearned premiums, its absence here is another fact telling against the pertinence of the Early case. It must not be forgotten that taxpayer, seeking a deduction from gross income, must bring itself plainly within some provision of the federal tax statute. New Colonial Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; McDonald v. Commissioner, 323 U.S. 57, 60, 65 S.Ct. 96, 155 A.L.R. 119; Equitable Life Assurance Society v. Commissioner, 321 U.S. 560, 64 S.Ct. 722, 88 L.Ed. 927.

Taxpayer makes much of an amendment to Section 434 of the New York statute, enacted April 9, 1945, after the Tax Court's decision, and effective June 1, 1945, Laws N.Y.1945, c. 635. Taxpayer urges that this amendment is but declaratory of the pre-existing law, and a brief of amicus curiae points to the fact that, on November 7, 1945, the Acting Commissioner of Internal Revenue advised a New York title insurance company that "unearned portions of the original premium reserve established and segregated" under the amended statute "as a reinsurance reserve from and after June 1, 1945, may be treated as 'unearned premiums'" but that "such unearned portions so established from June 1, 1938 to May 31, 1945" may not be so treated. To understand that letter, the amended statute must be read. It provides, inter alia, that the reserve prescribed in subsection 1 of § 434, called a "reinsurance reserve" in the amendment, shall "at all times and for all purposes be deemed and shall constitute unearned portions of the original premiums" and "shall be cumulative and * * * consist of" the reserve theretofore set up under subsection 1(a) of the statute before amendment and also, beginning June 1, 1945, of certain amounts and percentages of gross receipts. It further provides that, after June 1, 1953, "that portion of the reinsurance reserve established more than one hundred eighty months prior shall be released and shall no longer constitute part of the reinsurance reserve and may be used for any corporate purpose." This amendment obviously is far more than "declaratory." It represents a marked change, is strikingly different from the statutory provision now before us. We do not, however, now decide what, if any, may be its effect on the application of Internal Revenue Code, § 204.

Affirmed.

---

the above requirements had existed at and after the date of the contract. Said sums, herein required to be reserved for unearned premiums on contracts of title insurance shall at all times and for all purposes be considered and constitute unearned portions of the original premiums. In calculating reserves, contracts of title insurance shall be assumed to be dated in the middle of the year in which they were issued."

[2] Under subsection 1(a), for the first ten years, a reserve of "at least" 3% of the gross receipts must be set aside and "maintained." Under subsection 1(b), "in lieu of" the reserve required by (a), the company must set up and maintain "a similar reserve" of 3% of the gross receipts "received during the one hundred twenty immediately preceding calendar months," i. e., the immediately preceding ten years.

Roughly speaking, therefore, the result is that no funds can ever be released from the present reserve unless, if ever, 3% of the gross receipts for any ten-year period is less than 3% of the gross receipts for the first ten-year period.

Consequently, no one can say that any of the funds will ever be released and become "free assets."

It is also to be noted that the reserve in the first ten years is not 3% of the receipts but "at least" that percentage, so that a company could perhaps use its discretion to set aside a reserve larger than 3%; however, our decision would be the same without regard to that factor.