JOE (JOSEPH) DILLIER AND ANNA DILLIER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 80949–80955, 80957–80959, 95425–95433. Filed March 12, 1964

---

[1] The proceedings of the following petitioners are considered herewith: Fred Kaelin and Bertha Kaelin, docket No. 80950; Clarence W. Curnow and Inez Curnow, docket No. 80951; Thores Johnson and Dorothy Johnson, docket No. 80952; Frank Halter and Hedy Halter, docket No. 80953; Made Rite Manufacturing Co., docket No. 80954; Made Rite Investment Co., docket No. 80955; Made Rite Sausage Co., docket No. 80957; Made Rite Transportation Co., docket No. 80958; Made Rite Sales Co., docket No. 80959; Thores Johnson and Dorothy Johnson, docket No. 95425; Frank Halter and Hedy Halter, docket No. 95426; Joseph Dillier and Anna Dillier, docket No. 95427; Fred Kaelin and Bertha Kaelin, docket No. 95428; Made Rite Investment Co., docket No. 95429; Made Rite Sausage Co., docket No. 95430; Clarence W. Curnow and Martha Inez Curnow, docket No. 95431; Made Rite Transportation Co., docket No. 95432; and Made Rite Manufacturing Co., docket No. 95433.

*Wayne Hea*, for the petitioners.
*Douglas M. Moore*, for the respondent.

778

OPINION

TURNER, *Judge:* The first issue presented is whether the income of the Made Rite business for the period from July 18, 1955, through December 31, 1955, is taxable to the four Made Rite corporations, as the petitioners allege, or to the five partners, as the respondent contends. The respondent has conceded that the income earned during 1956 and succeeding years is taxable to the corporations.

The four Made Rite corporations came into existence when the respective articles of incorporation were filed with the secretary of state of California on July 29, 1955. Cal. Corp. Code, sec. 308. Therefore, our determination of this issue depends upon the time at which the business activities conducted by the partnership were taken over by the corporations. *Skarda* v. *Commissioner*, 250 F. 2d 429; *Central Auto Market*, 7 B.T.A. 973; *Niles Fire Brick Co.*, 6 B.T.A. 8.

The petitioners contend that the transfer of the business to the corporations took place on July 17, 1955, and in any event no later than August 1, 1955. It is the contention of the respondent that such transfer did not occur prior to 1956.

The facts show that no stock was issued by any of the corporations during 1955. Under California law, a permit from the California commissioner of corporations was a prerequisite to the issuance of stock by a corporation, Cal. Corp. Code, secs. 25500, 26100, but no application was made on behalf of any of the Made Rite corporations for such a permit during 1955.

At no time during 1955 was the partnership dissolved. The business was managed and operated by the partners after the filing of the articles of incorporation in the same manner as before. The bank accounts were maintained in the partnership name. No bank accounts were opened for any of the corporations during 1955, with the exception of a checking account for Transportation, which was opened on November 29, and was used, during the final month of 1955, to pay salaries to two mechanics and to Dillier. All other employees were paid throughout 1955 from the partnership account.

Customers of the business were not advised of any change in the business form, and no formal notification was made to suppliers. Nor can we conclude that the suppliers became aware informally of any change during 1955. When Johnson, the only one of the five partner-stockholders testifying, was queried on this point, he replied merely:

I know that when people would call whom we were dealing with we would assure them that the same people were responsible so that they would continue to supply us with meat, but some of them were aware that there were other corporations. There was information available * * * in the Credit Managers Association files in Sacramento; they had a change in the listing to show the four corporations, and there was a notice in the papers that we had incorporated.

No further evidence was introduced concerning the credit information or the newspaper notice, and the record does not shown that these events occurred during 1955.

On the other hand, the facts show that all of the various suppliers with whom the business dealt continued to address their invoices throughout 1955 to "Made Rite Sausage Company" or, in a few instances, merely to "Made Rite," with only one exception. The exception was an invoice for a quantity of imprinted check blanks, which was addressed to Manufacturing, the company for which the checks had been ordered. "Made Rite Sausage Company" was the name of one of the corporations, as well as the partnership, but the identity of names does not explain the continued billing in that name, since the corporation bearing that name purportedly made the bulk of its purchases from Manufacturing. Until various times in 1956 suppliers of many types of goods purportedly purchased by the other Made Rite corporations addressed their invoices to "Made Rite Sausage Company." Payment on all of the invoices received during 1955, including the one for the check blanks, was made from the partnership checking accounts.

The practice of the five partners of withdrawing $250 per week from the partnership general checking account continued unchanged during the third quarter of 1955. During the fourth quarter, payroll taxes were withheld from the increased weekly amounts they received, but the payments continued to be made from the partnership checking accounts, with the exception, as noted, of the payments to Dillier during December 1955.

The compensation paid to all employees throughout 1955 and to the five partners during the fourth quarter was reported on employer's quarterly Federal tax returns filed by the partnership. No such returns were filed by any of the Made Rite corporations during 1955. No State unemployment insurance returns were filed by any of the corporations during 1955, but such returns were filed by the partnership for both the third and fourth quarters of 1955.

Other business transactions in which the partnership participated during 1955 are shown by the evidence. Real estate was purchased by the partnership in September 1955. An application for an average rate for fire insurance on partnership property was submitted in October 1955, and an insurance policy was subsequently issued to the partnership as a result of the application. At various times during the second half of 1955, trucks were purchased and registered to the partnership. Throughout 1955 the only stationery used in the business bore the name Made Rite Sausage Co. The corporations appear from the record to have been mere corporate shells throughout 1955. Not until 1956 were any important steps taken to transfer operation of the business to them. During 1956 bank accounts were opened for Sausage, Manufacturing, and Investment; application was made for permits to issue stock and notes; the stock and notes were issued; the partnership agreement was terminated; title to the partnership motor vehicles and real estate was transferred to the corporations; suppliers were advised of the change in business form; the corporations began filing employer's quarterly Federal tax returns; and partnership insurance policies were endorsed to the corporations.

The petitioners attempt to justify the delay in transferring the business to the corporations as being common under California incorporation procedure. While a permit from the California commissioner of corporations was a prerequisite to the issuance of stock, the facts show that such permits were granted by the commissioner to the Made Rite corporations within 5 weeks after the respective applications had been made therefor. Had the applications been timely filed, there appears to be no reason why the stock could not have been issued within a short time after the filing of the articles of incorporation. It may be true, as the petitioners contend, that one of the reasons for the failure to file the applications earlier was the inability of the partners to agree upon the terms of the stock purchase agreements. Any such agreement, we note, was apparently required to be filed with the applications.[7] This excuse, while it may partially explain the delay, does not, however, justify the taxation to the corporations of the income earned by the partnership.

In contending that the income for the period in question should be taxed to the corporations, the petitioners emphasize the execution by the partners and the corporations of the "offers to transfer assets," the closing of the partnership books and the opening of the corporation books, and the filing of 1955 income tax returns on behalf of the corporations.

[7] See Cal. Corp. Code sec. 25502:

*Contents of application.* In such application the applicant shall set forth all of the following:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(g) A copy of any contract it proposes to make concerning such security.

The "offers to transfer assets," which purport to transfer the partnership assets to the respective corporations as of June 30, 1955, are undated but the petitioners claim that the offers were executed on August 1, 1955, at the directors' meetings purportedly held on that date. The evidence shows that the minutes of the purported meetings were not prepared until early in 1956, when they were written up in the attorney's office, and that certain of the actions recited in the minutes as having been taken at the meetings were not in fact taken on the date claimed. In view of this evidence, we think that doubt must be cast upon the testimony of the petitioners' witnesses that the offers to transfer assets were executed on August 1, 1955. Regardless of the date of their execution, however, the instruments appear to be merely in the nature of stock subscriptions, with the consideration for the issuance of the stock being the transfer of certain partnership assets. In our opinion, these instruments, whenever they were executed and however binding they may have been upon the parties, did not operate to shift the incidence of taxation to the corporations, prior to the actual taking over of the business operations by them.

Accounting ledgers for the four Made Rite corporations were opened by the accountant in October or November 1955, but it appears from the record that any figures which might have been entered in those ledgers lacked substance. With the exception of a bank account for Transportation existing during the final month of 1955, it has not been shown that any of the corporations had any assets during that year. Any purchases recorded on the corporate books were paper allocations of purchases for which payment was made out of the partnership bank account. All corporate salaries recorded, with the exception of the Transportation payroll for December, were allocations of amounts paid from the partnership payroll account. Figures for sales of meat products from Manufacturing to Sausage were the result of journal entries, with no money passing between the corporations. Rents from Manufacturing to Investment were merely the accountant's accruals based upon oral advice from Johnson, and none of the amounts so accrued were actually paid during 1955. The amount used as the closing inventory of the partnership and the opening inventory of Manufacturing was merely the figure obtained from the regular taking of inventory at the end of a 4-week period, which practice had been followed since at least as early as 1949. Nor do we think that the fact that income tax returns were filed on behalf of the four corporations for 1955 gives any substance to the transactions reported therein when the facts show that the business was still being conducted by the partnership. We note in passing that in the returns filed by the partnership and the corporations June 30, 1955, was stated as the closing date for the partnership business and July 1 as the commence-

ment date of the corporation businesses, even though the inventory used was taken on July 15, 16, and 17 and the articles of incorporation were not filed until July 29. In view of the considerable evidence that the corporations did not take over the operation of the business until 1956, the opening of the corporate books during 1955 and the filing of corporate returns for that year do not, in our opinion, require us to hold that any part of the income earned during 1955 is taxable to the corporations.

Upon consideration of all the evidence, we have concluded and found as a fact that the business activities of the partnership were not taken over by the four Made Rite corporations during 1955, and that the business continued to be operated by and for the benefit of the partnership throughout that year.

The cases relied on by the petitioners are distinguishable from this case. In *R. L. Brown Coal & Coke Co.*, 14 B.T.A. 609, it was found as a fact that, after the filing of articles of incorporation, the new corporation carried on a coal-mining business formerly conducted as an individual proprietorship. In the instant case the facts show the contrary.

In *Vaughn Lumber Co.* v. *United States*, 103 F. 2d 885, a partnership composed of individuals named Vaughan and Dascomb was dissolved and its business was subsequently taken over by a new association consisting of Dascomb and others. The association was held taxable on all the income of the business commencing with the date of dissolution of the original partnership. Dascomb and one of his associates, who had operated the business for a short period as an interim partnership while the details of organizing the association were being completed, were held to be "operating as trustees for the benefit of the association." In the instant case the partnership was not dissolved during 1955, nor did any new entity take over operation of the business during that year. The five partners continued to operate the business throughout the year.

We hold that the ordinary income and long-term capital gains of the business for 1955 were properly taxable to the partners, and the determinations of the respondent to that effect are sustained. See *Central Auto Market, supra; Niles Fire Brick Co., supra.*

In view of our holding that the income of the business for 1955 was taxable to the partners, it follows that no income tax was payable by the Made Rite corporations for that year. We, therefore, hold that the deficiencies in income tax against the corporations for 1955 arising from the denial of surtax exemptions were erroneously determined. The surtax exemptions for the years 1956 and 1959 remain in issue, however, and we now turn to a consideration of that issue.

By amendments to his answers filed herein, the respondent stated that his determinations were made in accordance with sections 269 and

482 of the 1954 Code. On brief, however, he has set forth no argument with respect to section 482, and is therefore deemed to have abandoned his contention that said section is applicable.

In imposing the surtax on the taxable income of a corporation, section 11(c) of the Code provides an exemption of $25,000. In section 269(a), it is provided that if a person or persons acquire control of a corporation and the principal purpose of such acquisition is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the deduction, credit, or allowance shall not be allowed. For the purposes of section 269(a)(1), control is defined as the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote.

Acquisition of control, as used in section 269, includes the formation of new corporations. *James Realty Co.* v. *United States*, 280 F. 2d 394; *Kessmar Construction Co.*, 39 T.C. 778.

Although in his determinations the respondent disallowed the surtax exemptions of all four of the Made Rite corporations, counsel for the respondent in his opening statement conceded that one surtax exemption should be allowed, either to one of the corporations or apportioned among the four corporations.

It is clear that Dillier, Kaelin, Johnson, Halter, and Curnow organized and by their stockholdings acquired control of the petitioner corporations, and that by forming four corporations, rather than one, three additional surtax exemptions were made available. The respondent has determined that the principal purpose for this arrangement was the avoidance of Federal income tax by securing the benefit of the additional surtax exemptions. The burden of showing facts which will justify a conclusion to the contrary is on the petitioners.

It is the contention of the petitioners that each of the four Made Rite corporations was a viable business entity and actually engaged in a substantive business activity: That Sausage sold meat products; that Manufacturing processed or manufactured meat products; that Investment owned and leased real estate; and that Transportation owned and leased trucks.

The facts show that the stock of each of the four Made Rite corporations was held in equal amounts by each of the five stockholders, and that when the corporations began to transact business, they operated a single, integrated business enterprise. Meat supplies were purchased and processed into sausage products, ham, and bacon, and the finished products were sold to retail outlets by driver-salesmen working in assigned territories. This was the same business that had theretofore been operated by a single entity, the partnership. The same division of duties among the five former partners prevailed as under the partnership.

The meat products manufactured or processed by Manufacturing were sold only through Sausage, and all receipts therefrom were deposited in the Sausage bank accounts. Although Sausage was purportedly an independent company selling meat products, it sold only the products of Manufacturing, with minor exceptions, and carried no inventory on its books. The entire inventory of the business was recorded on the books of Manufacturing, and "sales" from Manufacturing to Sausage were determined by calculations made after Sausage had sold the products to customers. All of the rental income of Investment represented intercompany payments from Manufacturing and Transportation, except for small amounts received from rental to unrelated parties of a parking lot and a few residential units. All of the rental income of Transportation represented intercompany payments from Sausage. No vehicles owned by Transportation were rented to outsiders.

The four corporations used a single office, at which the records for all four were kept. The signs upon the main plant and office building were limited to "Camellia Brand" and "Made Rite Sausage." The only listing for the business in the telephone directory was made in the name of Sausage.

It was the testimony of Johnson, who was the petitioners' principal witness, that at the time of incorporating the four Made Rite corporations it was his understanding that the business would get additional surtax exemptions if four corporations were formed rather than one, although it was his further testimony that this was not a decisive factor in making the decision. Johnson recited a number of alleged business purposes which he claimed motivated the organization of multiple corporations. Although some of the reasons advanced were unclear, the principal ones appear to be as follows: (1) That problems potentially arising from the death of a stockholder would be reduced; (2) that labor problems would be minimized; (3) that more accurate accounting figures for each function of the business would be obtained; (4) that limited liability would be obtained for each corporation; (5) that the adoption of profit-sharing or incentive plans would be facilitated; (6) that unequal cash withdrawals by the partners would be eliminated; and (7) that the discounting of secured notes issued to the stockholders could provide funds to pay off certain personal obligations of the stockholders.

An examination of the alleged business purposes reveals their lack of substance. According to Johnson, it had been felt that, in the event of the death of a stockholder, his heirs might be persuaded to retain the stock of the corporations holding the real estate and trucks. The benefit of this arrangement to the business would apparently be that if the heirs so decided, it would be necessary to raise cash only to acquire the decedent's stock in the sales and manufacturing com-

panies. The purported intention to hold the real estate and trucks for this purpose is not supported by the facts, however, which show that the trucks were sold and leased back and that efforts were made by the petitioners to do the same with the real estate. No reason was given as to why the stock of separate corporations holding the real estate and trucks would be more attractive to the heirs than the stock of a single corporation conducting the entire business, except to say that the two corporations would have "fixed income." However, the record shows that no dividends were paid by either Investment or Transportation during the taxable years. The record further shows that the trucks provided no income except through their use in the meatpacking business, which the petitioners maintain was speculative, and that the real estate did not provide a significant amount of outside income. If the heirs did not wish to retain their stock in these two corporations, Johnson testified, the real estate or trucks could be sold to raise cash to pay the heirs. No explanation is given as to why the real estate or trucks, if held in a single corporation, could not as readily have been sold to raise the needed cash.

With respect to labor problems, the contention appears to be that if the employees of either the manufacturing corporation or the sales corporation went on strike, the other corporation could continue to operate, since its employees would be members of different unions. Johnson testified, however, that the Made Rite business had "never had a strike of any consequence," and that "in the last thirty years we have had only a couple of days lost because of strikes." It was his further testimony that when there had been a strike by the members of the Teamsters Union, who worked for Sausage, their picket line had been honored by the members of the Butchers Union, who worked for Manufacturing. The facts also show that the employees of the partnership belonging to the Packers Union became employees of Manufacturing, but that neither the Packers Union nor the association which had bargained with that union on behalf of the partnership were ever advised of the change of employer.

We see little merit in the contention that the use of multiple corporations was necessary to provide accurate accounting figures for each department. Proper allocation of income and expenses could have been attained by a divisional accounting system, and it does not appear that the allocation between the corporations was made with precision. For example, rental payments for the five executive automobiles were all accrued against Sausage, even though some of the five stockholders were purportedly rendering services primarily to other corporations. As a further example, no office expenses were charged to Investment.

Johnson testified that at the time the corporations were organized the Made Rite business faced increasing competition from national

meatpacking firms. He stated that in the event the manufacturing operations became unprofitable, those operations could be discontinued and the sales company could continue to operate, selling products to be manufactured by others under the Made Rite label. By reason of the multiple corporations, the liability of the manufacturing corporation would be limited to the extent of its own assets. Yet the facts show that when Manufacturing sought sizable lines of credit from a bank in 1957 and 1958 the other three Made Rite corporations guaranteed repayment of the funds to be advanced by the bank and the five stockholders subordinated the notes they personally held against the corporations to the obligations to the bank.

The argument concerning the adoption of incentive or profit-sharing plans is also without foundation in the record. According to Johnson's testimony, the partners anticipated "that with the sales and manufacturing as separate organizations we could set up profit sharing incentive plans so that junior executives, which we would develop, would be in a position to share in the results of their efforts." There is no evidence, however, that the corporations ever adopted any such plan or seriously considered doing so. Nor is there evidence as to the identity of the "junior executives" for whose benefit the plans were to be instituted. The only executives appear to have been the five stockholders, who received approximately equal total compensation from the various Made Rite corporations, regardless of the profits or losses of the particular corporation or corporations purportedly employing them.

Neither of the final two alleged business purposes for the multiple corporations demonstrates any reason why a single corporation would not have been sufficient. Johnson testified that it had been a practice of the partners to make withdrawals of cash from the partnership to pay their individual taxes, and that the unequal withdrawals which resulted had caused friction among the partners. With the corporate setup, he said, "any dividend or any money coming out of the corporations would be in proportion to the shareholder's interest and not in proportion to his tax burden as an individual." The facts show that the stock of each of the four corporations was issued to the five stockholders in equal amounts. Therefore, the five would receive equal dividends in the same manner as though they had owned equal shares in a single corporation. Johnson also testified that the stockholders learned that a bank would discount corporate notes held by them and secured by real estate, and they could use the funds so received to pay off certain outstanding personal obligations. While it has been shown that the notes issued by Investment to the stockholders were secured by a first deed of trust on the plant and surrounding real property, no reason is advanced why it was necessary to place the real estate in a separate corporation in order to use it as security for the notes.

We are convinced, from our study of the record, that the alleged business objectives did not in fact motivate the organization of the multiple corporations. The one purpose of apparent substance was the obtaining of the additional surtax exemptions of which Johnson had cognizance.

As supporting their contention that the obtaining of additional surtax exemptions was not the principal purpose of organizing the multiple corporations, the petitioners also point to the fact that one surtax exemption was voluntarily given up when Sausage elected to report its income for the years 1958 and 1959 as a small business corporation under subchapter S of chapter 1 (secs. 1371–1377) of the Code. Subchapter S, which had not been enacted at the time the corporations were organized, provides in general for taxing the income of an electing corporation directly to its stockholders. Since there is no tax to the corporation, there is correspondingly no surtax exemption. An examination of the facts shows that the net income of Sausage was $37,922 in 1958 and $73,162.91 in 1959, and that dividends in the amount of $25,000 in 1958 and $57,078 in 1959 were paid to the stockholders. No dividends were paid by any of the other Made Rite corporations during those years. By making the election, therefore, it was possible to make all dividend payments to the stockholders from Sausage and avoid corporate taxation on the amounts so paid, retaining in the meantime the benefit of the surtax exemptions of the other corporations. Certainly this procedure did not make the three additional surtax exemptions less beneficial. The year 1958 was the first year for which such an election could have been made, as subchapter S became effective for the taxable years beginning after December 31, 1957.

The respondent in his determinations of deficiencies did not exercise the authority granted to him under section 269(b) [8] to allow a surtax exemption to one of the corporations or to allocate a single exemption among the four corporations. Instead, he disallowed the exemptions of all four corporations. Counsel for the respondent has conceded, however, that one surtax exemption should be allowed, and we think

---

[8] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

(b) POWER OF SECRETARY OR HIS DELEGATE TO ALLOW DEDUCTIONS, ETC., IN PART.—In any case to which subsection (a) applies the Secretary or his delegate is authorized—

(1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made : or

(2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income tax for which the acquisition was made ; or

(3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).

that the exemption should be allowed to Sausage. Sausage was the successor in name to the partnership. It did all of the selling and except for comparatively small amounts received as rent on a parking lot and a few residential units, the income of the entire operation was realized on the sales so made. All of the receipts from sales were deposited by Sausage in its bank account, and except for the aforesaid amounts of rent the income of the other three corporations consisted entirely of book allocations and intercompany transfers made directly or indirectly from Sausage. In light of the record, we have concluded that Sausage is entitled to surtax exemptions for the years 1956 and 1957, and we so hold. No corporate tax was payable by Sausage for 1958 and 1959, by virtue of its election to report its income under subchapter S, and therefore no surtax exemptions were available to it for those years.

The determinations of the respondent denying surtax exemptions to Manufacturing, Investment, and Transportation for the years 1956 through 1959 are sustained. *James Realty Co.* v. *United States, supra; Kessmar Construction Co., supra.*

The remaining issues deal with the deduction of amounts paid as compensation to officers and employees by two of the Made Rite corporations. In section 162(a)(1) of the Code, it is provided that deductions are to be allowed for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered."

Investment, on its returns for 1956 and 1957, claimed deductions of $34,009.80 and $6,560, respectively, being the full amounts paid by it as compensation to officers and employees in the said years. The respondent in his determination of deficiencies allowed as deductions $2,000 of the amount claimed in 1956 and $2,260 of the amount claimed in 1957, and disallowed the balance of the amounts claimed. Since the respondent did not make any determinations with respect to the individual salaries paid, but merely determined that the total deductions claimed were unreasonable, we must examine the individual salaries comprising those deductions.

The claimed deductions by Investment included $25,800 paid to Johnson in 1956 and $1,760 paid to him in 1957. With respect to the services performed by Johnson, the facts show that he performed general managerial duties for the business conducted by the Made Rite corporations, and was in charge of office and clerical functions, credit and collections, advertising, bookkeeping, purchasing of packaging supplies, and labor relations. The facts do not show what portion of his working time was devoted to the affairs of Investment, and from the description of his duties and the activities of Investment we cannot conclude that any substantial amount of his

time was so spent. The facts show that Johnson also devoted some time during 1956 to the affairs of a corporation named Zephyr Heights Subdivision, Inc., at Lake Tahoe, for which he received a salary of $4,800.

In attempting to justify the $25,800 paid to Johnson by Investment in 1956, the petitioners contend that such amount was set with a view toward "the time which he would have to devote in an endeavor to secure a sale and/or lease-back of the plant property." Although it was the testimony of Johnson that he attempted "many times" to sell the property, substantiating evidence was introduced with respect to only two efforts during the taxable years. The evidence shows that Johnson, in September 1956, had one or more telephone conversations with a real estate brokerage firm in Los Angeles, Calif., and received a letter from that firm naming a prospective purchaser of the Made Rite plant. A letter dated January 29, 1957, indicates that Johnson had met with representatives of Arden Milk Co., regarding a proposed exchange of stock with Arden. Although a leaseback is mentioned, the letter does not indicate what property was to be leased or to whom. No other evidence was introduced regarding Johnson's purported endeavors to secure a sale and leaseback of the plant, and it is clear that Investment never actually entered into such a transaction.

On the other hand, the facts show that the compensation of $25,800 paid to Johnson by Investment during 1956 was equal to the compensation paid during that year to each of the other four stockholders by one or more of the other Made Rite corporations. Nothing in the record indicates to us that such allocation of identical salaries was made other than arbitrarily, or that in setting the amount of compensation any consideration was given to the value of the services which Johnson was actually expected to render to Investment. As stated, the compensation paid Johnson by Investment was reduced to $1,760 for 1957. During 1958 and 1959 he received no compensation from that corporation. The respondent has conceded that the $1,760 paid to Johnson in 1957 was reasonable compensation for his services to Investment in that year. Considering the evidence and taking into account the activities of Johnson, which, so far as the record shows, were the same in 1956 as in 1957, we have found that a like amount of $1,760 represents reasonable compensation for his services to Investment during 1956.

Of the amount claimed as a deduction for 1956 by Investment, $5,238 represents compensation paid to Geneva Hayhurst. During 1956, she was the office manager for the business conducted by the four corporations but received compensation entirely from Investment. Her duties included supervision of the office services for all four corpora-

tions and keeping the books for Sausage and Manufacturing. The bulk of her work was concerned with the business of Sausage, with only a small portion of her time being devoted to the affairs of Investment. It was the testimony of Geneva Hayhurst that she had threatened to quit her position in 1955 because her workload had become greater than she could handle, and that as a result of her threat the job of bookkeeping for Transportation and Investment had been assigned to another employee in the office. During 1957, 1958, and 1959 she received no compensation from Investment. The petitioners do not contend that the amount paid to Geneva Hayhurst by Investment during 1956 represented reasonable compensation for her services to that corporation. It appears to be their contention, instead, that her entire salary was paid by Investment in order to offset the fact that Investment was not being charged by the other corporations for any office expenses, such as salaries of other personnel, stationery, and use of office equipment. The fact that the petitioners may have failed to allocate such expenses to Investment does not provide grounds for the deduction by Investment of the entire $5,238 paid to Geneva Hayhurst as "compensation for personal services actually rendered," under section 162(a)(1). No attempt was made to show what portion of the amount paid to her in fact represented reasonable compensation for services rendered to Investment. Using our best judgment based upon the evidence presented, we have found that $500 represented reasonable compensation for such services during 1956.

The amount claimed as a deduction by Investment in 1956 also includes $2,916.80 paid to Chester Brewster, the night watchman. His duties were to guard the main-plant building, title to which was transferred to Investment during 1956, as well as the property belonging to other Made Rite corporations located on the plant premises, including trucks, title to which was in Transportation, and machinery and inventory, listed as belonging to Manufacturing. While Brewster was on vacation for one week in 1956, Investment paid to his replacement, M. Schoenbacker, the amount of $55, which was also included in the deduction claimed for that year. During 1957, 1958, and 1959, the night watchmen employed in the Made Rite business received their entire compensation from Manufacturing. Upon consideration of the evidence, we have concluded and found that $1,200 and $25 of the amounts paid to Brewster and Schoenbacker, respectively, during 1956 represent reasonable compensation for their services to Investment.

The $6,560 claimed by Investment as a deduction in 1957 represents, in addition to the $1,760 paid to Johnson, the amount of $4,800 paid to Dillier. Having conceded that the amount paid to Johnson represented reasonable compensation for his services, the respondent contends that the reasonable value of any services rendered to Investment

by Dillier did not exceed $500. The record is devoid of any evidence of services performed by Dillier for Investment during 1957, except to indicate that he acted in an advisory capacity for all four corporations. The burden rests upon the petitioners to overcome the presumption of correctness which attaches to the respondent's determination, and the petitioners have failed to introduce evidence to do so. Accordingly, the determination of the respondent with respect to the compensation paid by Investment during 1957 is sustained.

Transportation, on its returns for 1956 and 1957, claimed deductions of $23,800 and $6,400, respectively, for compensation paid by it to Dillier. The respondent in his determination of deficiencies allowed as deductions $500 in each of the years and disallowed the balance. The facts show that the income of Transportation consisted entirely of intercompany allocations of rent from Sausage for vehicles used in the Made Rite business. The compensation of $23,800 paid to Dillier by Transportation during 1956, when added to the $2,000 paid to him by Sausage in that year, is equal to that paid during the year to each of the other four stockholders by one or more of the other Made Rite corporations. During 1957, Dillier's salary was allocated among all four of the Made Rite corporations, but the total compensation paid to him, $24,800, was equal to the compensation paid to Curnow, Halter, and Kaelin and only slightly in excess of the $24,560 paid to Johnson. Dillier received only $400 from Transportation during 1958 and nothing in 1959. No evidence was introduced as to any services performed by Dillier for Transportation, and we have not been shown that the allocation of portions of Dillier's compensation to Transportation was done other than arbitrarily. In our opinion, the record supports the respondent's determination that a reasonable allowance for compensation to Dillier for services rendered to Transportation does not exceed $500 for each of the years 1956 and 1957, and we therefore sustain the respondent's determination.

Rule 50 computations will be necessary in several of the cases by reason of certain stipulations.

> *Decisions in docket Nos. 80949, 80954, 80955, 80957, 80958, 80959, 95427, 95428, 95429 and 95431 will be entered under Rule 50.*
>
> *Decisions in docket Nos. 95425 and 95426 will be entered for the petitioners.*
>
> *Decisions in docket Nos. 80950, 80951, 80952, 80953, 95430, 95432 and 95433 will be entered for the respondent.*