MODERN HOME FIRE AND CASUALTY INSURANCE COMPANY, PETITIONER [1] *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1379–68.    Filed April 23, 1970.

*Paul Johnston*, for the petitioner.
*Robert D. Hoffman*, for the respondent.

---

[1] This case was consolidated for trial only with that of Modern Home Life Insurance Co., docket No. 1380–68.

OPINION

*Issue 1.—Taxability of Premium Reserve*

The petitioner contends that 15 percent of the premiums received on account of writing title insurance should properly be excluded or

deducted from gross income as "unearned premiums" within the meaning of section 832(b)(4). That section provides, in part, as follows:

(4) PREMIUMS EARNED.—The term "premiums earned on insurance contracts during the taxable year" means an amount computed as follows:

(A) From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance.

(B) To the result so obtained, add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.

The law governing such reserves in the case of title insurance appears to be well settled. The courts have held that the term "unearned premiums" is limited to the amount of the premium required to be set aside as a reserve and taken into income in a later year pursuant either to State law governing the writing of such insurance or pursuant to regulations adopted under authority granted by State law. *Early* v. *Lawyers Title Ins. Corporation*, 132 F. 2d 42 (C.A. 4, 1942); *Title & Trust Co.*, 15 T.C. 510 (1950), affd. 192 F. 2d 934 (C.A. 9, 1951); *City Title Ins. Co.* v. *Commissioner*, 152 F. 2d 859 (C.A. 2, 1946), affirming a Memorandum Opinion of this Court; *Title & Trust Co. of Florida* v. *United States*, 243 F. Supp. 42 (M.D. Fla. 1965), affirmed per curiam 360 F. 2d 285 (C.A. 5, 1966).

In *Early* v. *Lawyers Title Ins. Corporation, supra*, the court approved the exclusion from gross income of that portion of title insurance premiums required by a Virginia State statute to be set aside in an "unearned premium" reserve, because the court concluded that the State statute gave to that portion of the premium so reserved all of the attributes of "unearned premiums," that is, withdrew it from the power of the company to use for the company's general purposes for a specified period of time which was commensurate with the period of probable loss. This Court in *Title & Trust Co., supra*, followed the Fourth Circuit's decision in the *Early* case when a title insurance company set up an "unearned premium" reserve in compliance with the directive of the Oregon insurance commissioner issued pursuant to Oregon statutes.

However, in *City Title Ins. Co.* v. *Commissioner, supra*, as it could not be determined whether funds in a reserve established under a New York statute would ever be released and thus subject to tax, no part of the reserve was excluded from gross income. The same result was reached in *Title & Trust Co. of Florida* v. *United States, supra*, when an "unearned premium" reserve was established under a Florida statute that did not insure the return of the amounts placed in reserve to income.

The petitioner concedes that the laws of the State of Alabama do not

require a title insurance company to maintain an unearned premium reserve. However, the petitioner argues that since petitioner was authorized to write casualty insurance, with respect to which such laws provide for a premium reserve, and since the title insurance written by the petitioner was analogous to casualty insurance, the commissioner of insurance of the State of Alabama was authorized to prescribe and to require the maintenance of a premium reserve in the case of the petitioner. Assuming the latter, the petitioner relies on an exchange of correspondence for the exercise of such authority.

We must reject the petitioner's reasoning. First, the laws of Alabama did not require the petitioner to be authorized to write casualty insurance in connection with its title policies. The petitioner wrote such policies for more than 2 years before amending its charter in order to enable it to write casualty insurance. As a matter of fact, when the exchange of correspondence occurred, the petitioner's authority was limited to the writing of title insurance.

Secondly, while the title insurance written by the petitioner might differ from the more conventional policy of title insurance in that no effort was made to determine whether the mortgagee had a clear title at the time the policy was written, such insurance does not thereby become "casualty" insurance. The subsequent discovery of a prior judgment or lien against the owner of the property, which might well have been discovered if an investigation had been made when the policy was written, is not a "casualty" as that term is commonly understood.[3]

Finally, the record does not show that the Commissioner of insurance had authority to prescribe by regulation, or otherwise, an unearned premium reserve for the writing of title insurance. It can well be understood why such a reserve would be "acceptable" to the Commissioner of insurance since it obviously enhances the security of the insurance. He would have no reason to object. This does not mean, however, that he would have any authority to require a reserve.

## Issue 2. Deductibility of Claims Expenses

Section 832(c) provides, in part, as follows:

(c) DEDUCTIONS ALLOWED.—In computing the taxable income of an insurance company subject to the tax imposed by section 831, there shall be allowed as deductions:

\*        \*        \*        \*        \*        \*        \*

(4) losses incurred, as defined in subsection (b)(5) of this section;

---

[3] In Federal tax law a "casualty" is thought of as an event proceeding from an unknown cause, or as an unusual effect of a known cause, and occasioned by natural or external forces. See 5 Mertens, Law of Federal Income Taxation, sec. 28.57. In insurance law the term is, as a general rule, used to refer to accidental injury to persons and property. See Couch, Insurance, sec. 1.27 (2d ed.).

Section 832 (b) (5) provides, in part, as follows:

(5) Losses incurred.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts. * * *

It is obvious from the record that the petitioner adopted a course of conduct in its business which would, in the opinion of its officers, result in the maximum realization of profit. The petitioner was organized to take over a function, essential in the financing of the purchase of the shell homes sold by the construction company, which formerly had been fulfilled by unrelated insurers. These were unfinished houses sold on credit to purchasers who did not generally have the resources to purchase the more conventional house or to finance such a purchase through conventional sources. In that type of market, the cost of title insurance would have to be at a minimum. The method of operation became a question of economics.

At the time of the purchase, no investigation was made to determine whether the purchaser had a clear title to the land on which the home would be located. The purchaser's affidavit was accepted as sufficient. If a lien was subsequently discovered which took priority over the lien of the mortgagee, either the construction company or the mortgagor would take whatever action was necessary in order to discharge that lien and submit a claim to the petitioner for the resulting "loss." Without undertaking any independent investigation the petitioner paid that claim. Although the petitioner had the right of subrogation, it did not thereafter attempt to recover the amount from the purchaser. As the witness testified, this would be impractical.

The respondent apparently accepts the fact that in the case of such claims a lien was asserted which came within the terms of the policy and that the amount of the claim represented the cost of discharging that lien. The respondent's position seems to be that the petitioner should not be permitted to deduct the amount paid on the claim because it did not pursue its right to subrogation against the purchaser. Therefore, the respondent argues that there was not a "closed transaction."

The respondent ignores the practicalities of the marketplace. The petitioner's election not to pursue its right of subrogation was a business decision. That decision was based on petitioner's experience and grounded in the petitioner's reasonable belief that its rights against the mortgagors were of little or no value. A taxpayer certainly cannot be held accountable for failing to pursue its remedies before deducting a loss if based on its experience in the business the taxpayer concludes that to do so would on the average only result in a greater loss. We must recognize that private business looks upon the collection of its accounts in a more practical light than does the Government.

While the respondent also argues that some effect should be given

to the relationship between the insured and the insurer, the procedure adopted by the petitioner did not differ materially from the procedure followed by its predecessors who were wholly unrelated to the insured. The premium charge was the same.

## Issue 3. The Surtax Exemption

Modern Homes Construction Co. acquired the stock of petitioner from the DeLoach and Wells families in 1961. It is the respondent's contention that the principal purpose for the formation of the petitioner and the subsequent acquisition of the stock of petitioner was to avoid Federal income tax on the profits of petitioner by securing the benefit of an additional surtax exemption.

In 1960, and prior years, the stock of Modern Homes Construction Co. was owned equally by the DeLoach and Wells families. During that time, Modern Homes Construction Co. and its affiliated corporations purchased title insurance covering mortgages on houses sold by Modern Homes Construction Co. and accident and health insurance policies on the individual purchasers of these homes from unrelated insurance companies. After its organization in June 1960 petitioner insured title to the real property on which Modern Homes Construction Co. had built houses. After its organization in the same month, Modern Home Life Insurance Co. insured payments on the indebtedness to affiliates of Modern Homes Construction Co. in the event of injury or sickness of a purchaser of a home constructed by Modern Homes Construction Co. The stock of both these insurance companies was owned equally by the DeLoach and Wells families. Both insurance companies were small business corporations that had elected, pursuant to section 1372(a), not to be subject to corporate income tax, but to have all their income taxed directly to their shareholders. Since there was no tax imposed on the petitioner under section 11, there was correspondingly no surtax exemption available to it.

In 1961 the stock of both insurance companies was transferred to Modern Homes Construction Co. This transfer resulted in the termination of the previous elections of tax treatment as small business corporations, and this also made surtax exemptions available.

Relying on section 269,[4] respondent contends that petitioner was

---

[4] SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX.

   (a) IN GENERAL.—If—

   (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, * * *

   *      *      *      *      *      *

and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.

initially formed and subsequently acquired with tax avoidance as the "principal purpose." The primary issue for decision, for purposes of applying section 269, is whether the "principal purpose" in acquiring the petitioner was the evasion or avoidance of tax by securing the benefit of an additional surtax exemption. This is a question of fact, *Commissioner* v. *Chelsea Products, Inc.*, 197 F. 2d 620 (C.A. 3, 1952), affirming 16 T.C. 840, to be determined on the basis of the acquirers' purpose at the time control is acquired. See *Bush Hog Manufacturing Co.*, 42 T.C. 713 (1964). Respondent's determination is presumptively correct and the burden of showing the absence of the prohibited "principal purpose" is upon the petitioner. *House Beautiful Homes, Inc.* v. *Commissioner*, 405 F. 2d 61 (C.A. 10, 1968), affirming a Memorandum Opinion of this Court.

At the time the petitioner was organized the DeLoach and Wells families were aware of the generally beneficial tax treatment available to electing small business corporations. The primary benefit is that such entities are not subject to corporate income tax under section 11. This benefit, of course, does not indicate that petitioner was organized for the principal purpose of evasion and avoidance of income tax by securing the benefit of a surtax exemption.

The respondent states on brief that the organization of the petitioner as an electing small business corporation is not a bar to the application of section 269, citing *Joe (Joseph) Dillier*, 41 T.C. 762 (1964). The respondent then raises, as a secondary issue, the question of whether the election itself was for the "principal purpose" of avoidance of income tax due to the fact that J. W. Wells could offset his large net operating loss carryover against his share of the income of the petitioner.

We take this to be an argument by the respondent that the tax treatment of the shareholders of an electing small business corporation, and specifically the requirement of section 1373 that shareholders report certain amounts as constructive distributions from such a corporation, is an "other allowance" within the meaning of section 269, and therefore that section permits disallowance to petitioner of its status under subchapter S leaving it to be taxed like any ordinary business corporation, but without the benefit of the surtax exemption.

*Joe (Joseph) Dillier, supra,* involved the application of section 269 to surtax exemptions claimed by multiple corporations, one of which was an electing small business corporation. The taxpayer in that case argued that the fact that one of the corporations voluntarily gave up its surtax exemption supported his contention that the obtaining of additional surtax exemptions was not the principal purpose of organizing the multiple corporations. We dismissed this argument noting that the fact that one corporation could not claim a surtax exemption

as it was not subject to tax did not make the surtax exemptions less beneficial to the other corporations. Our decision in *Joe (Joseph) Dillier, supra,* does not support the position taken by respondent in the instant case.

The DeLoach and Wells families were aware of the generally beneficial tax treatment afforded electing small business corporations when they organized the petitioner. However, the record does not support the respondent's contention that the principal purpose in organizing the petitioner was to allow J. W. Wells to offset his losses against the petitioner's "undistributed taxable income." However, even if this was the case, the enjoyment of this benefit would be consistent with the intent of Congress to allow shareholders of electing small business corporations to "be taxed directly on the corporation's earnings" and to report "corporate income (whether or not distributed) as their own for tax purposes," S. Rept. No. 1983, 85th Cong., 2d Sess., p. 87, and thus cannot be regarded as tax avoidance.

The inapplicability of section 269 in an analogous context supports this conclusion. The respondent has ruled in I.T. 3757, 1945 C.B. 200, that even though the principal purpose for the formation of a Western Hemisphere trade corporation was to obtain the tax benefits provided for those corporations, such motivation does not constitute tax avoidance within the meaning of the predecessor of section 269. To the same effect, see *A. P. Green Export Co.* v. *United States,* 284 F. 2d 383 (Ct. Cl. 1960) ; *Barber-Greene Americas, Inc.,* 35 T.C. 365 (1960). The Court of Claims has also rejected the notion that section 269 should be applied to deny to a corporation the special tax treatment provided for life insurance companies. *Alinco Life Insurance Co.* v. *United States,* 373 F. 2d 336, 341 (Ct. Cl. 1967). See also Worthy, "IRS Chief Counsel Outlines What Lies Ahead for Professional Corporations," 32 J. Taxation 90 (1970), where the author indicates that a question exists as to whether there can be a purpose to evade or avoid taxes when a corporation is organized to take advantage of provisions that represent a deliberate granting of tax benefits.

Respondent contends that the principal purpose for the acquisition by Modern Homes Construction Co. of the stock of the petitioner was to secure the benefit of an additional surtax exemption. We disagree. The evidence in this case affirmatively establishes that the principal purpose for the transfer of petitioner from the DeLoach and Wells families to Modern Homes Construction Co. was to place the petitioner within the corporate group controlled by Modern Homes Construction Co. in connection with the public offering that had been made by that company.

Initially mortgage notes resulting from the sale of shell homes were

sold by Modern Homes Construction Co., or one of its affiliates, to nonaffiliated finance companies. Later an affiliate raised funds directly and used these funds to finance the sale of shell homes. In both cases title insurance was required on the property that secured the mortgage notes. Rather than allow the profits from the title insurance to go to unrelated parties, the petitioner was formed by the DeLoach and Wells families.

The proposed acquisition of petitioner by Modern Homes Construction Co. was made an item in the prospectus published in connection with the public offering stock. From Modern Homes Construction Co.'s point of view, the acquisition obviously improved the marketability of its stock as it allowed the company to offer the public participation in the profits generated by the title insurance placed on the shell homes. From the DeLoach and Wells families' point of view the acquisition was necessary to foreclose any question of conflict of interest as they remained the principal officers and directors of Modern Homes Construction Co. after the public had purchased approximately 40 percent of the stock of that company. These considerations constituted the principal purpose for the transfer of the stock of petitioner to the construction company.

Respondent argues that "initially Construction or Finance could have been a self-insurer." However, the decision not to self-insure was made before the petitioner was organized. Since the obligations were to be refinanced or hypothecated by the finance company, obviously neither the construction company nor the finance company could meet a requirement that there be insurance with respect to the title or that the debtor be covered by health, accident, or life insurance.

The respondent argues that the petitioner could have written the health and accident insurance so that it was not necessary separately to organize the Modern Home Life Insurance Co. The writing of title insurance and the writing of health and accident insurance involve different types of risk, and are subject to differing regulations. There is ample justification to separate those activities.

The Court finds nothing in this record which would support the respondent's determination that the petitioner was initially formed and subsequently acquired with tax avoidance as the "principal purpose." In fact, the evidence strongly supports the conclusion that the petitioner was organized and its stock subsequently acquired by Modern Homes Construction Co. for valid business reasons. Section 269 is not applicable.

*Decision will be entered under Rule 50.*